POSNER, Circuit Judge.
 

 The question presented by this bankruptcy appeal — a question that appears not to have" arisen before — is whether “gross income,” as it appears in the section of the Bankruptcy Code which defines “farmer,” is to be given the same meaning that it has in federal income tax law. The significance of the question lies in the fact that a farmer cannot be forced into bankruptcy against his will. 11 U.S.C. § 303(a). (A farmer can, of course, file voluntarily for bankruptcy. Indeed, voluntary bankruptcy for “family farmers” was liberalized recently. See Subtitle B of Title II of the Bankruptcy Judges, United States Trustees, and Family Farmers Bankruptcy Act of 1986, P.L. 99-554, Oct. 27, 1986.)
 

 
 *544
 
 Prior to the 1978 overhaul of the bankruptcy law the definition of “farmer” had undergone a painful statutory evolution each stage of which had generated considerable litigation. See Oler,
 
 The Farmer and the Bankruptcy Laws,
 
 40 Dickinson L.Rev. 122 (1936). In the last stage, the statute, still worded unclearly, had been interpreted to mean, “an individual personally engaged in farming,” provided that “the principal part of his income” was derived from farming. See 11 U.S.C. § 1(17) (1976 ed.);
 
 In re Beery,
 
 680 F.2d 705, 713 (10th Cir.1982). The substitution of an income test for the earlier tests of whether the individual was “chiefly” or “primarily” engaged in farming — tests hopelessly vague in practice, as shown by such cases as
 
 Powers v. Silberman,
 
 3 F.2d 802 (3d Cir.1925), and
 
 In re Macklem,
 
 22 F.2d 426 (D.Md.1927) — was a step toward greater precision; but the statute defined neither “principal part” nor “income,” and in particular it failed to indicate whether gross or net income was intended. See
 
 In re Beery, supra,
 
 680 F.2d at 713-17. Against this background Congress in the 1978 Code made a fresh start by defining “farmer” as one who “received more than 80 percent of [his] gross income during” his immediately preceding “taxable year ... from a farming operation owned or operated” by him. 11 U.S.C. § 101(17). (Section 101(18) defines “farming operation” to include “farming, tillage of the soil, dairy farming,” etc.) No legislative history bears on the question whether “gross income” in the new statute should be given the same meaning that it has in federal income tax law.
 

 The facts of this case are surprisingly lurid for a bankruptcy case. William Wagner has a substantial dairy farm in Wisconsin. In 1983, in circumstances not fully explained in the record, he struck a tenant farmer in the head four times with an iron bar, killing him. Wagner was prosecuted for first-degree murder, but acquitted. The victim’s widow, estate, and medical insurer brought a wrongful death suit against Wagner and obtained a damage judgment of nearly $350,000 in 1985. Six days later Wagner gave mortgages on his farm to the law firm that had handled the tort suit, and to his brother. Later he assigned the milk income from the farm (his major source of income) to his wife, along with half the proceeds from the sale of a car wash. The mortgages plus the judgment exceeded Wagner’s net worth and the income assignment dealt away his major source of income.
 

 The judgment creditors filed a petition for bankruptcy against Wagner under Chapter 7 of the Bankruptcy Code, seeking to set aside the mortgages and assignments as preferences. Rejecting Wagner’s claim that he was entitled to the farmer’s exemption from involuntary bankruptcy, the bankruptcy judge ordered the mortgages set aside, voided the assignments to Wagner’s wife, and held that Wagner’s debt to the judgment creditors was not dischargeable, since it was the outgrowth of an intentional tort. The effect of the bankruptcy judge’s rulings is that the assets of the farm will, to the extent necessary, be sold to satisfy the tort judgment. The district court affirmed, and Wagner appeals to us.
 

 Our appellate jurisdiction in bankruptcy cases is limited to final orders by the district court. See 28 U.S.C. § 158(d). The district court's order affirming the bankruptcy judge’s rulings in this case is final in the sense that nothing remains at the moment to be decided by the district judge, but not necessarily in the sense, intended by section 158(d), that the underlying proceeding has been wound up. See
 
 In re Riggsby,
 
 745 F.2d 1153, 1155-56 (7th Cir.1984). Technically the bankruptcy proceeding continues before the bankruptcy judge and will end only when Wagner, having satisfied (to the extent his assets allow) the debts he owes his creditors, is discharged. Nevertheless, under the somewhat relaxed standard of finality that prevails in bankruptcy cases even under the current law, see, e.g.,
 
 In re Memorial Estates, Inc.,
 
 797 F.2d 516, 519 (7th Cir.1986), the bankruptcy judge’s decision (and hence the district court’s order affirming it) is final for purposes of appeal if it resolves
 
 *545
 
 all contested issues on the merits and leaves merely the distribution of the assets of the bankrupt estate to creditors to be completed. That is the nature of the decision in this case. The bankruptcy judge has held that Wagner is subject to the bankruptcy proceeding, that his mortgages and assignments are void, and that his debt to the judgment creditors is not dischargea-ble. All that remains is for the trustee in bankruptcy to sell the farm and pay off the creditors (including Wagner’s law firm, now demoted to the status of an unsecured creditor). What remains corresponds to the collection stage in an ordinary lawsuit, cf.
 
 In re Morse Elec. Co.,
 
 805 F.2d 262, 264 (7th Cir.1986) — and of course a defendant who loses a damage suit need not (indeed, may not) wait till the judgment has been paid before he can appeal. The collection proceedings are a collateral stage of the litigation. This conclusion rests on the practical considerations that the process of collection is unlikely to affect the issues on appeal and that once the defendant’s assets are handed over to the plaintiff it may be impossible, or at least very costly, for him to get them back through supplementary proceedings should it turn out that the judgment was erroneous. The present case is thus unlike
 
 In re Goldblatt Bros., Inc.,
 
 758 F.2d 1248 (7th Cir.1985), or
 
 Armstrong v. Corn Belt Bank,
 
 55 B.R. 755, 14 Collier’s Bankr.Cas.2d 69 (D.C.C.D.Ill. 1985), in both of which substantive issues remained to be resolved by the bankruptcy judge.
 

 Since in the present case the bankruptcy judge’s order was final, the district judge’s order of affirmance was also final, and we can proceed to the merits.
 

 For purposes of applying the definition of “farmer” in 11 U.S.C. § 101(17), we look to Wagner’s “gross income” in calendar year 1984, his last taxable year before the filing of the bankruptcy petition (Wagner is a calendar-year taxpayer). His gross income — as it was shown, or at least should have been shown, on his 1984 federal income tax return — was $104,000 (we round off all figures to the nearest $1,000), of which $72,000 indisputably was farming income because it was proceeds from the sale of milk and cattle. Some of Wagner’s other income — in particular, $8,000 from the sale of the car wash — was indisputably not farming income. In dispute is the proper characterization of $18,000 that he received as a distribution from an individual retirement account to which in previous years he had made contributions from his farming income. If the $18,000 is either treated as farming income or excluded from gross income, then more than 80 percent of Wagner’s gross income came from farming operations and he is exempt from involuntary bankruptcy. Otherwise he falls below the 80 percent threshold and the district court's decision must be affirmed.
 

 We can set to one side the suggestion that the $18,000 is includable in gross income for purposes of section 101(17) as farming income because its ultimate origin was in a farming operation. Such treatment would involve double counting of a dramatic sort. Money contributed to an IRA is treated for tax purposes as a part of gross income, but not of adjusted gross income; deducting such contributions is one of the adjustments that is made in translating gross income into adjusted gross income. See 26 U.S.C. §§ 62(10), 219(a), 408(d)(1), (e)(1). So when Wagner received the money that he contributed to the IRA it was part of his gross income, and since it was income from a farming operation it counted toward the 80 percent threshold for exemption from involuntary bankruptcy. To treat it as farming income when it is withdrawn from the IRA would be to count the same money as farming income twice. A practical consequence would be that if Wagner, who is 67 years old, retired from farming altogether — sold his farm and moved to Florida — he would still be a farmer within the meaning of the statute, and hence would be immune from being forced into bankruptcy provided that more than 80 percent of his retirement income came from his IRA. Although double counting could be prevented by excluding the initial receipt of the income that he contributed to an IRA from gross income
 
 *546
 
 for bankruptcy purposes, that would result in the extraordinary paradox that a farmer who contributed a large fraction of his farming income to an IRA might as a result not be classified as a farmer in the year the income was received yet be classified as a farmer years later when he left farming and started drawing from the IRA.
 

 The hard question is not whether the $18,000 that Wagner drew from his IRA should be treated as farming income— clearly it should not be — but whether it should be excluded from gross income for bankruptcy purposes because it represents in part deferred income from Wagner’s dairy farm. It is not as if Wagner in 1984 obtained less than 80 percent of his income from farming and the rest from some other type of business. He had some indisputably nonfarming income, such as the capital gain from the sale of the car wash, but he was certainly a “farmer” in the ordinary-language sense of the word rather than a person primarily engaged in some other activity who does farming on the side — a gentleman farmer or hobby farmer. The main supplement to Wagner’s 1984 income from farming came from the early withdrawal from his retirement account to finance his defense of the tort suit (early withdrawal not because he couldn’t retire at age 67 but because he hasn’t retired). And the income that funded that account was income from farming.
 

 But if one thing is crystal clear from section 101(17) it is that Congress was not using the word “farmer” in its ordinary-language sense. That had been essentially the approach of the previous law (call it the “mud on the boots” approach). It had led to excessive uncertainty in application and was abandoned for a mechanical approach in which “farmer” is a technical term that means someone who in the taxable year immediately preceding the filing of the involuntary petition in bankruptcy derives more than 80 percent of his gross income from farming. From the statutory references to “taxable year” and “gross income,” both themselves technical terms, though of tax law rather than bankruptcy law, it is possible to infer that Congress intended to use these terms in section 101(17) in their tax sense. Certainly “taxable year” is so used; Wagner does not dispute that. Whether “gross income” was intended to be used in its tax sense is less certain. Maybe, as Wagner argues, Congress used “taxable year” merely to spare the farmer the bother of having to keep an additional set of books in order to be sure not to lose his bankruptcy exemption.
 

 Wagner’s strongest point is that his IRA distributions are, to a substantial though unquantified extent, a return of capital, rather than income. If he had put a part of his farm income into a savings account rather than an IRA and had later withdrawn it, only the interest on the deposit would be deemed income for tax purposes. Is it not arbitrary, he asks, to deem all of the distribution from the IRA income, when in fact a substantial part of it is really just the principal being returned to him?
 

 We agree that merely to read section 101(17) does not answer the question whether the statute uses “gross income” in the tax sense. In contrast to several other sections of the United States Code, neither section 101(17) nor any other section pertinent to the farmer’s exemption from bankruptcy says that “gross income” means the same thing as it does in the Internal Revenue Code, see 7 U.S.C. § 1929a(h); 42 U.S.C. §§ 411(a), 1382(d) — though it would be unrealistic to attach any weight to this omission: the United States Code is not the work of a single omniscient intellect. We acknowledge the force of Wagner’s analogy of an IRA distribution to a savings-account withdrawal, and the force of his example of a “farmer” who, since most of his income comes from municipal bonds and hence is not counted as gross income for federal income tax purposes, see 26 U.S.C. § 103(a), is entitled to the exemption. ■ We recognize that Congress may have used the word “gross” not in order to create a compound expression that would point unequivocally to tax law but to make clear that the bankruptcy exemption could be used by
 
 *547
 
 farmers whose net income was low because of heavy expenses. Those are, indeed, the very farmers most likely to have a use for an exemption from involuntary bankruptcy. The traditional rationalization of the farmer’s exemption is that the cyclical pattern of farm prices abnormally depresses farmers’ net incomes in some years, making it impossible for them to pay their creditors. See, e.g., S.Rep. No. 989, 95th Cong., 2d Sess. 32 (1978), U.S.Code Cong. & Admin. News 1978, p. 5787. Of course many other businessmen — owners of ski resorts for example — are in the same fix; and how farmers as a group can actually benefit from the exemption is unclear, since lenders who do not have access to bankruptcy remedies in the event of default will charge higher interest rates to cover the increased risk of loss, though the present case involves involuntary creditors — Wagner’s tort victims. But none of these are issues for a court to worry about.
 

 Yet, on balance, the interpretation that will best carry out Congress’s purposes in the Bankruptcy Code is that gross income for purposes of the farmer’s exemption has the same meaning as in the Internal Revenue Code. The language and background of section 101(17) show that Congress wanted a mechanical, which is to say an easily applicable, test for “farmer” rather than a test that would reflect the economic realities of agriculture. The use of a flat 80 percent income criterion was certain to produce both overinclusion and underinclusion. Farmers who derive 79 percent of their income from farming are not distinguishable to the naked or any other eye from those who derive 81 percent of their income from farming. Indeed, Congress’s choice of 80 percent rather than 50 or 67 or 75 or 90 was unexplained and seems to have had nothing to do with the nature of farming. See 124 Cong.Rec. 32393 (1978) (remarks of Congressman Edwards); 124 Cong.Rec. 33993 (1978) (remarks of Sen. DeConcini);
 
 In re Blanton Smith Corp.,
 
 7 B.R. 410, 3 Collier Bankr. Cas.2d 358, 361-62 (Bankr.M.D.Tenn.1980). Given the quintessential arbitrariness of section 101(17), little would be gained by devoting substantial judicial resources to fine-tuning the concept of “gross income.” The population of farmers would still be arbitrarily distributed around the 80 percent mark. But much would be lost. The decision to bring a bankruptcy action must often be and here was made in a hurry. Within a week after the jury’s verdict in the wrongful-death case Wagner was taking steps to put his assets and income beyond the reach of judgment creditors. The creditors had to decide forthwith how to proceed — whether to pursue their remedies under state law or under federal bankruptcy law. Often and here creditors know a fair amount about their debtor’s income (here the information would have come out in the tort action, where punitive damages were sought and awarded) and can readily determine what his gross income for tax purposes was last year and how much of it came from farming; if they don’t know, and file a petition for involuntary bankruptcy, and in fact the debtor derives more than 80 percent of his gross income (in the tax sense) from farming, the debtor will quickly tell them, and prove it by his tax return. But for either creditor or debtor to decide what the debtor’s gross income is in some sense of “gross income” that is significant for the policy of the bankruptcy law would be an altogether more uncertain undertaking, at least until the courts had evolved a jurisprudence of gross income for this purpose. The threshold determination of eligibility for the exemption should not be subject to such uncertainty. Debtors and creditors ought to be able to know from the start whether the debtor is exempt from bankruptcy; they would not know till much later if we embarked on the protracted undertaking of constructing, in common law manner, case by case, a new jurisprudence of gross income. All this assumes moreover that “income” itself is a straightforward concept; it is no more straightforward than “gross” income is. Compare
 
 Howell v. United States,
 
 775 F.2d 887 (7th Cir.1985).
 

 We do not want to overstate the difficulties. Because most farming assets — not
 
 *548
 
 only land, buildings, and equipment but also crops and animals — are pledged as security to creditors, and because secured creditors need not utilize bankruptcy in order to enforce their secured debts, see, e.g.,
 
 In re J. Catton Farms, Inc.,
 
 779 F.2d 1242, 1247 (7th Cir.1985), farm bankruptcies are (popular belief to the contrary notwithstanding) rare even when agriculture is depressed. Farms “go broke” often enough, but rarely are petitioned into involuntary bankruptcy even though many real farmers are not protected by the exemption. This is only the third reported case under the 1978 Code in which the exemption has been invoked. But the infrequency of litigation in this area is not a good argument for adopting the qualitative test urged by Wagner. That very infrequency may mean that it could take many years to complete the judicial elaboration of a concept of bankruptcy gross income — though litigation might become more frequent if farmers who flunked the 80 percent test thought they would have a shot at passing it by recharacterizing their tax gross income for purposes of section 101(17).
 

 If all that were at stake were the correct characterization of IRA ■withdrawals, the uncertainties of the course urged by Wagner would be minimal. But as his counsel readily acknowledged at argument, the divorce between the tax and bankruptcy meanings of gross income could not be limited to IRA withdrawals. Take a case where a farmer has substantial income from tax-free municipal bonds. Such income is not gross income for tax purposes, but if IRA withdrawals should be deducted from gross income for purposes of applying the bankruptcy exemption, surely tax-free income should be added back; it is real income, however it may be classified for tax purposes. Wagner agrees that it should be added back, because he wants to show that his approach need not on balance enlarge the exemption. But what then of gifts and bequests? In Henry Simons’ influential economic analysis of federal income taxation, all accessions to wealth are treated as income, and income is deemed income when realized, not when received— so that the appreciation of securities is income even if the securities are not sold. See Personal Income Taxation chs. 2, 7 (1938). If Simons’ definition of income were adopted for purposes of fleshing out the statutory term “gross income,” then a major part of Wagner’s IRA withdrawals would indeed be excluded from gross income — but any gifts or bequests that Wagner received in 1984, and any net appreciation in land, securities, or other property owned by him, would be included in it. There is no limit to the subtleties that lawyers steeped in the economics of income and wealth could excogitate in defense of this or that inclusion or exclusion. Suppose Wagner’s children had income in 1984; should some part of that income be assigned to him on the theory that a man derives a real benefit from increases in his children’s wealth? Cf.
 
 CBI Industries, Inc. v. Horton,
 
 682 F.2d 643, 647 (7th Cir. 1982); Becker, A Treatise on the Family, ch. 8 (1981). Or suppose he had collected a personal-injury damages judgment some part of which reflected a loss of future earnings. The damages would not be in-cludable in gross income for tax purposes; should they be for bankruptcy purposes, because the damages replaced income that would be included? Wagner’s counsel says that, if we rule for him, “litigants can lay down their tax codes and pick up their accounting books.” But “gross income” is not an accounting term; for accountants, “income” is a net concept. They use terms like “revenue” and “gross sales” to mean what Wagner means by “gross income.” Wagner has not persuaded us that accounting concepts can readily be transposed to the present context.
 

 Moreover, no matter how brilliantly the courts aligned the concept of gross income in the Bankruptcy Code with the best thinking of economists and accountants on the difference between income and capital, the statutory definition of farmer would still be arbitrary. The brilliance would be wasted, but bankruptcy litigation would be fomented, and both debtors and creditors would be made worse off, since creditors
 
 *549
 
 when extending credit to a farmer wouldn’t know what their remedies were in the event of default and farmers wouldn’t know whether they were exempt from bankruptcy. The way to make section 101(17) work best is to make it work simply. That is most easily done by deeming the statute to incorporate the definition of gross income in federal income tax law. Then everyone will know where he stands. Given the arbitrary nature of the statutory definition of farmer, no higher value than certainty can be served by the interpretation of the words gross income; and the interpretation that best serves that value is the one that equates gross income in the Bankruptcy Code to gross income in the tax code. Needless to say, we express no view on whether the same equation should be made in interpreting other statutes that use the words “gross income” without express reference to the Internal Revenue Code. See 2 U.S.C. § 707(1); 5 U.S.C.App. § 209(1); 42 U.S.C. § 300n(3)(C).
 

 Affirmed.