**In re Arlon ROTT and Rhodell Rott, Debtors.**

**Bankruptcy No. 87–05098.**

United States Bankruptcy Court, D. North Dakota.

April 20, 1987.

Daniel Wentz, Fargo, N.D., for debtors.

Mark Weber, Minneapolis, Minn., Paul Scheerer, Minneapolis, Minn., Jon Brakke, Fargo, N.D., for Aetna Life, John Levine, Kim Anderson.

Wayne Drewes, Fargo, N.D., trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matters before the court include a section 506 valuation hearing on farm real estate mortgaged to Aetna Insurance Com-pany (Aetna) and a Chapter 12 confirma-tion, both brought on by the debtors, Arlon and Rhodell Rott (Debtors), who filed Chap-ter 12 on January 29, 1987. The initial plan was filed on January 29, 1987, and the amended plan now under consideration was filed March 3, 1987. Aetna and the U.S. Trustee both filed their written objections to the plan, as originally filed, and continue to persist in their objections as to the amended plan. A hearing was held before the undersigned on March 4, 1987, at which time evidence was introduced concerning both the real estate valuation and the abili-ty of the amended plan to be confirmed. The court finds the material facts to be as follows:

### *Findings of Fact*
#### 1.
#### THE VALUATION

The Debtors and Aetna both introduced evidence from their respective expert ap-praisers regarding the real estate valua-tion. Preparatory to determining the value of real estate which the Debtors propose to keep under their plan, the court will deter-mine the value of property which the Debt-ors propose to give back to Aetna.

The East Half of Section 16, Township 137 North, Range 64 West, is denoted as "Tract "A" by Don Doll (Doll), the Debtors' appraiser, and as "Parcel 1" by W. Gordon Christianson (Christianson), Aetna's ap-praiser. This property is valued by both parties at approximately $200.00 per acre for a total value of $63,400.00.

The other parcel which the Debtors pro-pose to turn back to Aetna, "Tract C"/"Parcel # 2", consists of 634 acres de-scribed as the Northeast Quarter of Section 14, Township 133 North, Range 61 West, and the South Two-thirds of the Northeast Quarter, the South Two-thirds of the East Half of the Northwest Quarter, the South-west Quarter, and the Southeast Quarter, Section 13, Township 133 North, Range 61 West. This property, which is inferior in quality to Tract A/Parcel 1 contains 67.2% crop land, with the remainder as pasture and wasteland. Pasture and wasteland is generally less valuable than cropland. Doll

valued this property at $200.00 per acre. Christianson valued the 426 crop land acres at $150.00 per acre and the 208 acres of pasture land at $100.00 per acre, for a total valuation of $84,700.00. Although neither appraiser was able to find sales minimally comparable to this property, Christianson relied on USDA officers, soil conservation officials, the county director of tax equalization, and his own estimates of value in making his appraisal of this real estate. This land is subject to wind and water erosion and is Class II and III crop land, with the non-crop land being Class III and IV. Although Doll appraised this land at $200.00 per acre, the court believes that Christianson's appraisal is more reflective of the property's value. Thus, the court concludes that the value of Tract C/Parcel 2 is $84,700.00.

The remaining 1,213 acres are referred to as "Tract B" by Doll and "Parcels 3, 4, 5, and 6" by Christianson. This property, which the Debtors propose to keep under the plan, is located within a twelve square mile area approximately 35 miles from Tract C/Parcel 2.

Doll, pursuant to the Debtors' attorney's instructions, appraised Tract B as an entire tract, although there are four non-contiguous parcels within that tract. Doll then made a downward adjustment of the value of this tract because larger tracts have less potential buyers, and sell for a lesser price on the market, than do smaller tracts the size of most of the comparables used by the appraisers. When asked why the property cannot be split into separate parcels, Doll stated that economic feasibility dictates that it be sold as a single farm. The court notes that only one of forty-two comparables examined by Doll approaches the size of Tract B, that being 1,400 acres of neighboring farmland formerly owned by the Debtors' brother, Virgil Rott, and presently owned by Connecticut General Life Insurance Company. The Connecticut General sale is pending, and not yet consummated. Although Connecticut General apparently believes that the Virgil Rott property is best sold as one unit, the court believes that the highest value for Tract B would be realized by selling the property in four separate parcels, as appraised by Christianson.

Due to the fact that Doll appraised Tract B as a single unit, did not assign values to individual portions of it, and did not indicate how much he reduced the value of the tract because of its large size, the court is inclined to rely more heavily on the appraisal analysis and comparables used by Christianson in placing values on the four individual parcels contained in Tract B. Nevertheless, Doll's appraisal and testimony is helpful in making appropriate adjustments to Christianson's appraisal.

Doll believes that the Connecticut General property is very comparable to Tract B and that, were the sale consummated, and had a lis pendens not been filed against it, this sale would certainly be the most relevant comparable which he has found. Although the sale is still pending, it is nevertheless a good indicator of the value of farmland in Tract B, particularly neighboring Parcels 3, 4, and 5. The lis pendens and the large size of the Connecticut General property may tend to somewhat depress the sale price. Because of these factors, the court will not place as much reliance on this comparable as did Doll. However, in appraising Parcels 4 and 5, the court will average this comparable in with the five other most significant comparables used by Doll in appraising Tract B which were also used by Christianson in appraising Parcels 4 and 5. The improvements and buildings on the Connecticut General property, which were later withdrawn from the pending sale, are similar to those of the Debtors'. The value of 1,400 acres of Connecticut General property is $200,000.00, or $143.00 per acre.

Christianson used five comparables in appraising Parcels 4 and 5. He adjusted these comparables for quality and for a decline in land values of ten percent per year since the date the comparables sold. Christianson did not indicate how he arrived at the ten percent value decline. Doll, however, did a detailed comparison of land sales in the area which have occurred during the past year, and concluded that the land values are declining at the rate of

two percent per month. Doll further testified that stressful land market conditions exist in the Debtors' neighborhood, thus contributing to the rapid decline. Doll's observation of these stressful market conditions is further substantiated by the fact that one-fourth of the farmland in a seventeen section area containing Tract B would have been on the market within a year's time, were the Debtors' property to be sold. Thus, the court believes it appropriate to adjust Christianson's comparables downward at the rate of two percent per month. Based upon the evidence before it, the court arrives at the value of Parcels 4 and 5 as follows:

| Comparable | Date Sale Occurred | Per Acre Sale Price | Quality In Relation To | | The Value After Making 2% Per Month And Quality Adjustment | |
|---|---|---|---|---|---|---|
| | | | Parcel 4 | Parcel 5 | Parcel 4 | Parcel 5 |
| 37 | 1–18–76 | $352 | 10% | 20% | $234 | $208 |
| 38 | 2–02–87 | $219 | 20% | 10% | $258 | $237 |
| 39 | 2–02–87 | $232 | 5% | 5% | $236 | $216 |
| 41 | 1–02–87 | $323 | 10% | 20% | $279 | $248 |
| 45 | 2–02–87 | $175 | 40% | 30% | $241 | $224 |
| Conn.Gen. Prop. | pending | $140 | | | $143 | $143 |
| Average value of adjusted comparables and the value of subject property for purposes of this hearing. | | | | | $232 | $213 |

Based on the above analysis, the court finds that Parcel 4, described as the North Half of Section 27, Township 136 North, Range 64 West, a total of 316 acres, is valued at $232.00 per acre or $73,312.00. Parcel 5, described as the South Half and South 100 acres of the North Half, Section 17, Township 136 North, Range 64 West, a total of 417 acres, is valued at $213.00 per acre for a total value of $88,821.00.

Parcel 3 includes the Northeast Quarter of Section 29 and the Northwest Quarter of Section 28. This land has, until recent years, been irrigated by the Debtors. However, the land is not suited for continuing irrigation because adverse salt buildup is occurring. Christianson recognizes that the land may not be suited for continuous irrigation, but still appraised the land as irrigated acreage, at $350.00 per acre. The sole comparable was a quarter of land located approximately 40 miles from the subject site. Christianson testified that were the land to be appraised as dry land, it would be valued at $300 per acre, or a little less. Based upon the quality, location, and percent crop land of Parcel 3 in relation to Parcel 5, and as compared to comparables relied upon by the appraisers, the court concludes that the bare real estate value of this property is $250.00 per acre for a total value of $80,000.00. This parcel also contains the Debtors' house, bins, sheds, and other buildings, having a contributory value of $25,000.00 for a total value of $105,-000.00.

The remaining parcel, Parcel 6, described as the Southeast Quarter of Section 11, Township 136 North, Range 64 West, appears to be the finest land owned by the Debtors. Christianson appraised this property at $325.00 per acre, based on his comparables numbered 15, 25, and 41. By using Christianson's three comparables, making the percentage quality adjustment as listed in them, and adjusting for a decline in land values of 2% per month, the court concludes that Parcel 6, based upon Christianson's comparables, is valued at $300.00 per acre, for a total value of $48,000.00. Based upon the location of this parcel, and the high quality, the court does not believe it appropriate to use the Connecticut General comparable for this valuation.

Thus, the value of Tract B, is $315,-133.00, with the individual parcels valued as follows:

| | |
|---|---|
| Parcel 3 | $105,000.00 |
| Parcel 4 | $ 73,312.00 |
| Parcel 5 | $ 88,821.00 |
| Parcel 6 | $ 48,000.00 |
| Total Value | $315,133.00 |

## 2.
## THE PLAN TREATMENT

Prior to filing Chapter 12, the Debtors, via negotiations and return of collateral, managed to eliminate indebtedness to various creditors, including Production Credit Association and Norwest Bank. In 1985, the Debtors returned PCA's collateral, which included farm equipment, in consideration for elimination of its indebtedness to PCA. The Debtors also returned land to Norwest Bank valued at $50,000.00, in consideration for elimination of the Debtors' $134,000.00 indebtedness to Norwest. The Debtor testified that this settlement occurred in 1984. However, counsel for Aetna and the Debtors seem to agree that a $60,000.00 debt forgiveness in regard to this transaction occurred in 1986. The court is unable to determine why the transfer occurred one or two years prior to the time the debt was forgiven. Furthermore, the court is unable to determine how counsel arrive at the $60,000.00 debt forgiveness figure, in view of the fact that total indebtedness was $134,000.00, less the $50,000.00 value of property returned to Norwest, leaving approximately $84,000.00 debt remaining.

Some years prior to bankruptcy, the Debtors, as vendors, entered into a contract for deed with Delton Heib for the sale of farmland earlier referred to as Tract A, along with an additional quarter of land. Upon review of the transcript and counsels' briefs, the court is unable to ascertain the exact nature of the Hieb transaction. It appears, however, that Hieb defaulted on his payments to the Debtors, and the Debtors, in consequence thereof, commenced an action to cancel the contract for deed. Arlon Rott testified that in settlement of all actions against Hieb, Heib conveyed Tract A to the Debtors in 1986. Additionally, Heib paid the Debtors $10,041.00 in 1986 as a final payment on the land in question. This amount is characterized as interest income on the Debtors tax return. However, the Debtor also testified that he quit-claimed his interest in Tract A to Hieb, and that Hieb has control of Tract A. Clearly, the Debtor is confused either as to the questions asked at the hearing, or regarding the legal nature of the settlement. To further confuse matters, the Debtor lists the property in Tract A as his property on his bankruptcy schedule.

During 1986, Rhodell Rott received $3,803.00 gross income from off-farm employment. The Debtors' gross farm income from direct farming was $19,326.00. The Debtors also received $15,440.00 from their son for the rent of farmland and equipment to him, and $11,910.00 from rental property in Bismarck. The rental arrangement with the Debtors' son is done on a temporary basis in an effort to retain the farm.

The Debtors' major creditor is Aetna, holding principal debt of $471,965.41 plus accrued interest through February 1, 1987, in the amount of $128,303.41, for total debt of approximately $600,000.00. The Debtors propose to transfer to Aetna all real estate in which Aetna holds a mortgage, excluding Tract B, free and clear of junior liens and encumbrances subject only to the redemption rights of the estate. In addition, Aetna would obtain the irrigation equipment mortgaged to it as well, subject to the right of the Debtor to challenge the perfected lien status of that property. The Debtors propose to reduce Aetna's claim by the value of the surrendered property.

The Debtors propose that Aetna · be deemed to have a first mortgage lien on Tract B in the amount equal to the value of the property, which shall constitute the secured portion of the debt. This debt shall be amortized over thirty years, with equal annual principal payments, plus interest amortized over thirty years. This debt shall bear interest at an annual "real rate" of 1½ to 3%, with real rate being defined as 1½ to 3% above the rate of inflation of U.S. currency. The Debtors propose to have the present mortgage satisfied of record, with a new mortgage being issued and made of record. Aetna's rate, for its best custom-

ers, is 9¾% which will only be loaned against approximately 50% of the appraised value of the collateral received.

To the extent that Aetna's claim is worth more than the real estate proposed to be transferred to it, along with the real estate mortgage proposed to be issued, the Debtors propose that the "deficiency", at Aetna's option, be waived, or a deficiency judgment be obtained in state court, and to the extent a deficiency is allowed, it would be treated as a Class 7 unsecured claim.

The Debtors also propose to pay to the trustee for a three year period, disposable income for distribution to unsecured claimants. In addition to the "disposable income", the Debtors propose to pay, prior to the third and final distribution under the plan, a sum equal to the value of all unencumbered and non-exempt assets held by the Debtors as of the effective date of the plan.

The Debtors, after making operating, living and mortgage payments, including a $17,146.00 payment to Aetna, project a disposable income of $4,498 per year. The Debtors' plan contemplates directly farming their own land, renting additional acreage, and renting machinery from their son.

### Conclusions of Law

#### 1.

■ The initial issue before the court is whether the Debtors qualify as "family farmers" under the bankruptcy laws. Aetna moved for dismissal on the basis that the Debtors are not eligible for Chapter 12 relief. However, the burden of proof in establishing eligibility for bankruptcy relief is on the party filing the petition. *See Jenkins v. Petitioning Creditor—Ray E. Friedman*, 664 F.2d 184, 186 (8th Cir.1981); *In re Mozer*, 1 B.R. 350 (D.Colo.1979). A "family farmer" is an:

individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose ... debts ... arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual

and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed....

11 U.S.C. § 101(17)

Farming operation "includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state". 11 U.S.C. § 101(20).

Two issues arise, in applying the above definitions: what is included as gross income, and what is included in that portion of gross income considered to be derived from a farming operation?

The Seventh Circuit in *In re Wagner*, 808 F.2d 542 (7th Cir.1986) held that for purposes of determining if a debtor is exempt from an involuntary petition under the farming exception, *see* 11 U.S.C. § 303(a); 11 U.S.C. § 101(19), gross income for purposes of the calculation is equated to gross income under the tax code. However, the Seventh Circuit only a couple of months later, included money received from sale of farm machinery in its gross income calculation. *In re Armstrong*, 812 F.2d 1024, 1027 (7th Cir.1987). The facts do not reflect whether this property had any depreciable basis remaining, but if it did, only the amount received above the adjusted basis would constitute income for tax purposes, *see* 26 U.S.C. § 1245, while the *Armstrong* court appeared to include all of the income as income for purposes of its calculation.

The *Wagner* court, while recognizing the deficiencies and inadequacies of its approach in using taxable gross income, decided to establish this approach because of the simplicity and certainty which it incorporated into the Bankruptcy Code. While there certainly is merit to these reasons, this court does not believe that judicial economy, procedural convenience, and predictability should be placed above the flexible nature of the Bankruptcy Code, and the

objective of reaching just and equitable results for both parties. The circumstances of each case shall be considered because "gross income" is not an accounting term capable of precise definition. *In re Wagner*, 808 F.2d at 548. It is this court's opinion, that the Debtors' 1986 gross income includes the following:

| Amount | Source of Income |
| --- | --- |
| $ 3,803.00 | Rhodell Rott wages |
| $19,326.00 | Direct farming income |
| $10,041.00 | Hieb payment |
| $15,440.00 | Farmland and equipment rental from son |
| $11,910.00 | Bismarck property rental |
| $60,520.00 | Total gross income |

Aetna argues that the $60,000.00 forgiveness of Norwest indebtedness should constitute gross income, because it is income for tax purposes. While it may be income for tax purposes, the court is not convinced by Aetna's argument. No cash was received by the Debtors in consequence of this transaction. Furthermore, a debtor should not be penalized for attempting to satisfy creditors pre-petition; creditors with unsecured indebtedness, such as Aetna, are primary beneficiaries of any pre-petition debt voluntarily forgiven. Moreover, were the forgiven debt included as gross income, the court would probably include it as income derived from that of a farming operation, as it is wholly related to the Debtors' farming activities.

Aetna also argues that less than 50 percent of the Debtors' income is derived from a farming operation. The parties do not dispute that the $11,910.00 Bismarck rental income and the $3,803.00 off farm wages are not income derived from a farming operation. Likewise, the parties do not dispute that $19,326.00 is farm income. The parties do, however, dispute whether the Hieb payment and the farmland and equipment rents constitute farm or non-farm income. Aetna relies heavily on *Armstrong v. Corn Belt Bank*, 55 B.R. 755 (C.D.Ill.1985) in support of its argument that farm and equipment rental income and interest on a contract for deed do not constitute farm income. The District Court in *Armstrong* held that cash rent income for farmland received up-front is not included

as farm income, because it is not subject to the inherent risks and the speculative nature of income associated with farming. *Armstrong*, 55 B.R. at 760. Aetna submits that the reasoning of the *Armstrong* District Court case is directly applicable to the present case. However, Aetna apparently is unaware that the *Armstrong* case, while affirmed on its face, was recently somewhat modified by the Seventh Circuit. On appeal, the Seventh Circuit concluded that the district and bankruptcy courts were in error in not holding that income from the sale of the debtor's farm equipment constituted income received from a farming operation. *In re Armstrong*, 812 F.2d 1024, 1047 (7th Cir.1987). The Seventh Circuit found that the machinery was "inescapably interwoven with [the] farming operation". *Id.* at 1026. The court also opined that the Bankruptcy Code definition of "farming operation" does not provide an all inclusive list of tasks or activities. "Implicit in this definition is the inclusion of general activities inherent in farming and, we believe, the means ... necessary to perpetuate the farming operation the definition speaks of. When a farmer sells *some* of his machinery in an effort to scale down his operation ... and save the farm, the money received is inescapably from the 50% of the farming operation dissolved". *Id.* (emphasis added). Moreover, the Seventh Circuit believed that Congress did not envision that farmers, by merely pruning their operation to keep a failed enterprise afloat, should be placed outside the farmer definition of the Bankruptcy Code. *Id.* at 1027.

■ The Seventh Circuit did, however, affirm the District Court's conclusion that when a farmer receives *cash rent, upfront* for leasing real property, this income is not subject to any of the inherent risks associated with farming, and is considered non-farm income. *Id.* While this court does not today adopt the Seventh Circuit's position concerning rental income as an inflexible rule to be applied in every situation, it is a useful guide in defining farm or non-farm income. The facts in the case at bar are nevertheless distinguishable. There is no evidence on the record before the court

that the Debtors' rental income from their son, for use of equipment and farmland, was cash rent, paid up front, and not subject to the inherent risks of farming. In all likelihood the Debtors got paid because their son earned enough from his farm production to pay them. Moreover, the Debtors in working with their son in an attempt to save the farm, are so intertwined as a family farm operation, that the rental income must be characterized as income from a farming operation in determining the Debtors' eligibility for Chapter 12 relief.

The income from the Hieb transaction, although not precisely defined as interest, principal payment, settlement payment, or rent, is also subject to the inherent risks of farming, as is clearly evidenced by Hieb's inability to maintain the payments on the farmland, which resulted in the Debtors settling for a final cash payment.

■ After extensive deliberation, this court is unable to formulate a mechanical test for parties to use in determining gross farm income, for purposes of determining eligibility for Chapter 12. The court does not believe that farmers forced to *partially* liquidate assets or *temporarily* rent out machinery or farmland, in an effort to salvage their farm operation, should be foreclosed from seeking relief under Chapter 12, if such actions cause the 50% farm income test not to be met. Clearly, Congress did not intend that farmers who make sound business decisions pre-bankruptcy in an effort to remedy their financial woes should be excluded from Chapter 12 relief when their immediate intention is to reorganize by actually farming. While an empirical formula for determining Chapter 12 eligibility would be convenient and desirable, this court's beliefs are in line with the dissenting opinion in the Seventh Circuit *Armstrong* case, that "it is appropriate for courts to try to draw realistic distinctions ... on a case-by-case basis, focusing on whether the income in question is essentially derived from a farming operation that is owned or operated by the recipient of the income and that reflects the traditional farming risks of cyclical and

unpredictable income". *In re Armstrong,* 812 F.2d at 1031. *See also, In re Dakota Lay'd Eggs,* 57 B.R. 648, 656 (Bankr.D.N. D.1986). The Eighth Circuit has held that adequate protection is to be decided on a case-by-case basis. *In re Briggs Transp. Co.,* 780 F.2d 1339, 1346 (8th Cir.1985). Whether income is farm or non-farm income for purposes of determining eligibility for Chapter 12 relief is no more capable of a determination as a matter of law, than is adequate protection.

Accordingly, all but $15,713.00 (Bismarck rental property income of $11,910.00 and off-farm wages of $3,803.00) of the Debtors' $60,520.00 gross income, or 74%, is income derived from a farming operation. The Debtors meet the 50% requirement and have sustained their burden of establishing eligibility for Chapter 12 relief.

2.

■ Aetna objects to the Debtors' amended plan alleging that requirements of section 1225(a)(5)(B) are not met. Section 1125(a)(5)(B) provides as follows:

(5) with respect to each allowed secured claim provided for by the plan—

\*　　\*　　\*　　\*　　\*　　\*

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim....

11 U.S.C. § 1225(a)(5)(B).

Aetna objects to the plan provision providing that Aetna's existing mortgages would be deemed satisfied, that any remaining judgment of foreclosure be removed from public record, and that Aetna be issued a new mortgage. If a debtor obtains confirmation of a plan, and the plan is ultimately complied with, the unsecured portion of a secured creditor's claim under Chapter 12 would generally be discharged once the plan is completed. *See* 11 U.S.C. § 1228. If payments to secured creditors become in default after the plan is complet-

ed, the secured creditor may then foreclose on the secured portion of its debt, but is prohibited from foreclosing on the discharged unsecured portion of its debt. However, if payments under a plan are not completed, and the unsecured debt is not discharged, a secured creditor may foreclose on its original collateral to the extent of the entire debt secured by the mortgage, not just the secured portion. If the Debtors in the instant case obtain confirmation of a plan, and complete payments thereunder, they will not be prejudiced by the initial mortgages being left in place. However, if the initial mortgages, and judgments of record, are deemed satisfied on the effective date of the plan, Aetna may well be prejudiced. Priority disputes may arise, and foreclosure proceedings may have to be started anew. No purpose is served by issuing a new mortgage to Aetna in place of its old mortgages. While Chapter 11 provides for more liberal treatment of secured creditors' mortgages and liens, *see* 11 U.S.C. § 1129(b)(2)(A)(iii), section 1225(a)(5)(B)(i) requires that *the* lien be retained, not *a* lien. Aetna's objection in this regard is well taken.

▉ Aetna also objects to the Debtors' proposed payment on Aetna's secured claim, based upon a real interest rate of one and one-half to three percent, which means an interest rate of one and one-half to three percent above the inflation rate, adjusted on an annual basis. Courts are not in uniformity concerning appropriate interest rate standards to be used in protecting the present value of a secured creditor's claim. Most courts, however, suggest that a prevailing market rate be used. *See, e.g., In re Welco Industries, Inc.*, 60 B.R. 880 (Bankr. 9th Cir.1986); *In re Wolf*, 61 B.R. 1010 (Bankr.N.D.Iowa 1986); *In re Neff*, 60 B.R. 448 (Bankr.N.D.Tex.1985). Courts, however, use a variety of methods to determine what the market rate of interest is at a particular time. *See generally*, Note, *The Proper Discount Rate Under the Chapter 11 Cramdown Provision: Should Secured Creditors Retain Their State Law Entitlements?* 72 Va.L.Rev. 1499 (1986). Clearly, there is no evidence to suggest that the Debtors proposed inter-

est rate is the current market rate of interest. The interest rate applied to a secured creditor's claim, whether it be in Chapter 11 or Chapter 12, is not considered in view of what the interest rates historically have been, what they should be in view of one's economic philosophy, or what they need to be to make a debtor's plan feasible. Rather, a secured creditor is entitled to receive payments under a plan, equal to the present value of its interest based upon a discount rate equal to the market rate, contract rate, some combination thereof, or some other fair and equitable method. The variable rate as proposed by the Debtors would presently provide an interest rate of approximately 5%, a substantial amount less than even the prime rate, and almost one-half the rate which Aetna currently provides to its very best customers, who obtain financing on 50% of the appraised value of property to be mortgaged. This treatment does not meet the requirements of section 1225(a)(5)(B).

▉ Aetna also objects to the Debtors' proposal to return Tract A and Tract C subject to the Debtors' right of redemption. This treatment does not comply with section 1225(a)(5)(C) of the Code. Absent Aetna's acceptance of the plan, the Debtors must *surrender* their interest in property securing Aetna's claim, if they do not choose to keep it under the plan.

▉ Furthermore, Aetna objects to the Debtors' plan to the extent that the unsecured portion of Aetna's claim would, at the election of Aetna be either waived or determined by a state court in a deficiency judgment action. This treatment clearly violates section 506(a). Moreover, the inability of a creditor to obtain a deficiency judgment in state court does not eliminate the debt or claim, but simply prohibits execution to recover on the claim. How the Debtors propose to hold a trial for a deficiency judgment in state court, absence a foreclosure sale, is beyond this court's imagination. Without a sheriff's sale, no bench mark from which to determine a deficiency judgment would exist. Finally, this court has already determined the fair

market value of the property being returned to Aetna. Thus, it appears to the court that as a matter of law, the Debtors would receive the fair value of the mortgaged premises, as their plan proposes that its indebtedness to Aetna be reduced by the fair market value of the property being returned to it. *See* N.D.Cent.Code § 32–19–06 (1976).

Aetna also objects that the Debtors' plan fails to comply with the feasibility requirements of section 1225(a)(6) and that Chapter 12 is unconstitutional. In view of the aforementioned infirmities in the Debtors' plan, it is unnecessary for the court to address these objections at this time.

The United States Trustee also raises numerous objections, many of which are well taken. Most of these objections may be easily corrected. However, the trustee's major objection appears to be that trustee's fees are not provided for under the plan. The Chapter 12 standing trustee is entitled to a percentage fee of all payments made under a Chapter 12 plan. 28 U.S.C. § 586(e)(1)(B)(ii). Thus, the trustee's fees must be provided for under the plan. This court is presently of the opinion that all payments to impaired claimholders, made during the three to five-year term of a Chapter 12 plan, whether disbursed by the debtor or the trustee, are considered to be payments made under the plan and are thus subject to the trustee's percentage fees. *See In re Hagensick,* 73 B.R. 710, 714 (Bankr.N.D.Iowa, 1987). Of course, this treatment is subject to agreement between Chapter 12 debtors and the standing trustees for different treatment. This court is also of the position that these payments are not necessarily subject to the maximum 10% fee rate allowed the trustee. *See Id.*

Accordingly, and for the reasons stated herein, IT IS ORDERED that the value of Tract A is $63,400.00, the value of Tract C is $84,700.00, and the value of Tract B is $315,133.00, with the individual parcels valued as follows: Parcel 3, $105,000.00; Parcel 4, $73,312.00; Parcel 5, $88,821.00 and Parcel 6, $48,000.00.

IT IS FURTHER ORDERED that confirmation of the Debtors' first amended plan under Chapter 12 is DENIED, as the requirements of 11 U.S.C. § 1225 have not been met.