**In re Randy OSTER, Debtor.**

**Bankruptcy No. 92–30616.**

United States Bankruptcy Court,
D. North Dakota.

March 5, 1993.

Thomas Disselhorst, Bismarck, ND, for debtor.

Marilyn Foss, Bismarck, ND, for First State Bank of Goodri.

Clare Hochhalter, Bismarck, ND, U.S. Atty./FmHA.

Phillip D. Armstrong, Minot, ND, Trustee.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is confirmation of the Debtor's Chapter 12 Plan of Reorganization filed on January 7, 1993, a hearing on which was held on January 25, 1993. The only unresolved objections are those raised by the First State Bank of Goodrich (Bank), who has long opposed the Debtor's reorganization efforts and who presently holds a $106,000.00 state court judgment by reason of conversion of collateral pledged as security. The Bank com-

menced an adversary proceeding seeking to have the judgment declared nondischargeable under sections 523(a)(2)(B), (a)(4) and (a)(6). Trial of this adversary is scheduled for April 7, 1993.

1.

The Debtor and his wife commenced farming in 1977 through the purchase of 1,080 acres, 530 of which are tillable, financed through the FmHA and upon which they operated a diversified grain and livestock operation. Originally the operation had both stock cows which were managed on a 60% share basis and leased dairy cows from which were produced milk and calves. The Bank had a lien on the livestock as well as various items of machinery and equipment. The Bank, experiencing difficulties with its loan and the Debtor's care of its collateral, sued the Debtor for conversion and obtained a judgment in March of 1992. It then proceeded to recover its remaining collateral consisting of machinery and equipment through sheriff's levy with a sheriff's sale scheduled for June 16, 1992. The sale was effectively stopped by the Debtor filing for relief under Chapter 13. This prompted motions for dismissal and relief from stay by the Bank resulting in an order which, in part, allowed the voluntary conversion to a Chapter 12.

Since 1978 the Debtor's operation experienced losses for the years 1979, 1983, 1986, 1988, 1989, 1990, 1991 and 1992 and in every year since 1986 an operating loan was necessary to maintain cash flow. In 1988 he experienced a loss of $10,100.00, in 1989 a loss of $7,633.00 and in 1990 a loss of $9,329.00. He has made no payment to the FmHA since 1978 and still was unable to maintain a positive cash flow. Finally, in 1989 the Debtor began selling off or leasing his livestock with most of the proceeds being consumed for operating expenses, despite and in contravention of the Bank's lien. He completely ceased the dairy operation in 1991 because of an inability to obtain an operating loan which he testified was necessary for feed. By 1992 he had completely disposed of all livestock and had essentially ceased farming.

From 1992 to the present, the Debtor's and his wife's exclusive source of income has been from non-farm jobs except for about $6,000.00 representing his share of the 1992 cash grain crop. At present the Debtor has $2,500.00 cash on hand and an old line of farm equipment. He also has a dairy facility which, while central to his intended reorganization, is in need of some maintenance and repairs in order to bring it up to acceptable standards.

The total outstanding debt to FmHA is $602,000.00 plus interest, the secured portion of which is $164,000.00 based upon the value of the mortgaged real property. The Bank has a security interest in all farm equipment and livestock, the exact extent of which is in some dispute. The Debtor acknowledges the Bank's lien as extending to specifically enumerated items of equipment valued by the Debtor at $25,000.00 based upon prior testimony rendered by an appraiser hired by the Bank. The Bank, however, claims the Debtor has undervalued major pieces of equipment and has completely omitted others. For its record of secured machinery and equipment the Bank relies upon a detailed inventory done while the Bank had the property in custody pursuant to the sheriff's levy. It also relies upon bankruptcy Schedule B–3. These two documents reveal a wind powered generator worth $3,000.00 that was apparently omitted. The Bank also asserts that the value of $25,000.00 assigned to the remaining items is too low despite the fact that its own auctioneer testified to an approximate worth of between $20,000.00 and $25,000.00. The auctioneer's testimony is the best evidence available and, with the addition of the generator, is accepted by the court as being the likely value of all existing machinery, equipment and vehicles in which the Bank has a security interest. Thus, the Bank's secured claim is approximately $28,000.00. Beyond this sum, the Debtor is possibly liable for the state court judgment in the event it is deemed nondischargeable.

### 2.

The Debtor's reorganization is completely dependent upon his re-entry into the livestock business. He intends to lease 30 dairy cows and manage 125 stock cows on a 60% share basis. He believes the income from these animals coupled with the anticipated off-farm income earned by he and his wife will be adequate to fund the plan as presently envisioned. The plan projects 1993 farm income of $77,984.00 derived from crop sales of $4,000.00, calf sales of $41,500.00 and $32,484.00 in milk proceeds. Off-farm income is comprised of his wages of $3,600.00 and his wife's of $8,000.00. It is to be observed, however, that in the prior years 1988, 1989, and 1990 no off-farm income is reported for his wife. The Debtor testified saying that the 1988 return was not correct which, of course, raises some question of credibility as regards the projected off-farm income. In any event, over the ensuing five years of the plan, calf sale income is projected to increase by 13% and milk income by 9%. Other income inputs remain about the same. The fundamental problem with the Debtor's notion of re-entry into the livestock business is the fact that at the present he has no animals. Although testifying that the plan is premised upon having cows in place by January 31, 1993, the Debtor conceded that that date would not be met. Furthermore, the dairy facility itself is still in need of some renovation and as of the date of the confirmation hearing it had not been inspected or approved by the North Dakota Dairy Commission. As of the date of the confirmation hearing no dairy cow leasing had taken place. Moreover, and most critical, is the fact that the Debtor's expense projections fail to contain any amount for dairy leasing—an amount which he agreed would be about $10,000.00 annually. He also conceded that his existing available pasture acreage may be insufficient and he might be required to rent additional land as he had in the past. Previously, when he had approximately 125 head, which is what he projects into his operation, he had to rent an additional 500 acres. The Debtor has made no provision for this possibility apparently hoping that moisture levels will be considerably better than in past years eliminating the need for more pasture. The plan also provides that at the end of five

years the Debtor will buy out the dairy lease yet no source of funding has been identified for this eventuality.

Farm related expenses over the five-year term of the plan are significantly reduced from past experience despite the fact that he claims past years were drought years and despite the fact that he projects to run the same herd numbers as previously. It appears to the court that the Debtor has arbitrarily reduced certain expenses to figures that conveniently fit his wish list agenda. Fuel has been reduced from $4,000.00 for 1988 and 1989 to $3,500.00 for 1993 yet the Debtor agreed the tractors he will be using are the same ones he has used in the past. Nothing has been projected for seed expenses yet in past years he has spent as much as $2,600.00 for seed. Repairs are cut from a historically average of $12,000.00 for the years 1988 through 1991, to $7,500.00 for 1993 rising to a high of $10,500.00 by 1997. Yet the Debtor conceded that his machinery was older now and that older equipment may well need more repairs. Supplies have also been significantly reduced from historical figures yet the Debtor agreed that supplies are not getting any cheaper and could offer no credible explanation for the projected decrease. His total farm expenses for 1993 are projected at $45,630.00 plus living expenses of $15,000.00. The court, however, believes these figures are unsupported by either the available historical data or by testimony. At a minimum, the farm-related expenses would have to be increased by $10,000.00 to factor in the dairy cow lease expense. On top of that it is more likely the Debtor will experience fuel, seed and repair expenses similar to past experience for an additional annual expense of approximately $7,600.00 in the aggregate. This means the likely annual expenses will actually be closer to $78,230.00 rather than the $60,630.00 projected.

Under the Debtor's proposed plan, accepting his figures as accurate, he would have $27,027.00 available for payment of all claims in the first year of plan operation. In fact, however, using more accurate expense projections, the Debtor will likely have something in the area of $11,-000.00 available for plan payments in the first year and similar amounts in the ensuing years.

As presently proposed, and based upon the Debtor's own figures, he will need $15,-260.00 to pay FmHA and $5,032.00 to pay the Bank plus administrative expenses of $3,387.00 in the first plan year. On top of this the Debtor has administrative priority expenses and a contingent nondischargeable claim of $106,000.00 which by itself would raise grave cash flow problems. Without accounting for a heightened trustee's fee, the Debtor's plan is already deficient by $12,679.00.

3.

 The Bank has raised a number of objections to the plan noting that, as drafted, it contains several Code deficiencies. While not all of these will be discussed, several are worth noting. First of all the Debtor has attempted to avoid payment of the standing trustee's fee by making direct payments to impaired creditors, FmHA and the Bank. In creating Chapter 12 Congress intended that the trustee play a central role in case administration and to that end provided that the trustee be compensated at a fixed commission not to exceed 10% on any payments under the plan. This court has adopted the view that all payments on impaired claims constitute "payments under the plan" regardless of who makes the actual disbursement. *In re Rott*, 73 B.R. 366 (Bankr.D.N.D.1987). A debtor cannot, by plan terms, avoid payment of the trustee's fee on impaired claims. *In re Fulkrod*, 973 F.2d 801 (9th Cir.1992). Presently trustee Armstrong's Chapter 12 fee commission is set at 5% and he is entitled to receive that fee on all payments made under the plan including disbursements to both FmHA and the Bank regardless of whether they are made by the trustee or the Debtor. If one applies this omitted calculation to the payments envisioned by the Debtor's plan it means an additional annual payment of $1,120.00 in recognition of the trustee's commission.

 Other of the Bank's objections have merit as well but most critical is the charge

that the plan is patently not feasible. It is upon this objection that the question of confirmability ultimately turns. This issue is not new since it was a concern on a prior occasion when the Bank sought dismissal of the previous Chapter 13. At that hearing the court expressed doubt about the feasibility of reorganization.

■ Plan feasibility as a confirmation standard requires that the Debtor establish that he will be able to make all of the payments under the plan. 11 U.S.C. § 1225(a)(6). Although, the court will afford a debtor the benefit of the doubt, it will not confirm plans which at best are problematic and fraught with unsupported projections. *See In re Ziebarth*, 113 B.R. 591 (Bankr.D.N.D.1990); *In re Rott, supra; In re Konzak*, 78 B.R. 990 (Bankr. D.N.D.1987). From the testimony presented it is apparent the Debtor has given little thought to the accuracy of his figures. He has omitted essential expense items while inflating livestock yields all in the face of historical losses. He has admitted that in the past his operation failed without the availability of operating loans yet his projections not only omit a provision for such cash infusion but fail to provide a funding source for initial dairy acquisition or eventual buy out. Even more problematical is the very real specter of having a substantial nondischargeable judgment to deal with. Even without factoring in that very real possibility, the Debtor's projected income figures, even assuming they are accurate, will be insufficient to fund debt service once more realistic expense figures are factored in. As previously noted, the Debtor's plan is under water by at least $12,679.00 without accounting for the trustee's fee. Once a trustee's fee is calculated on the Debtor's own proposed payments the deficiency escalates to $13,799.00 in the first year and by a similar amount in succeeding years. Feasibility projections must be based upon objective facts. The court finds that the Debtor's proposed projections are unrealistically optimistic with expenses being mere conjecture at best. The plan is simply not feasible and the court can envision no scenario under which a Chapter 12 plan can be made feasible.

Accordingly, and for the reasons stated confirmation is DENIED.

**SO ORDERED.**