In re Ramona **MOIX–MCNUTT, Debtor.**

**Bankruptcy No. 97–40003M.**

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

April 29, 1998.

R.J. Brown, C. Richard Crockett, Little Rock, AR, for Debtor.

### ORDER

JAMES G. MIXON, Bankruptcy Judge.

This matter is before the Court to determine whether R.J. Brown, C. Richard Crockett, and Crockett & Brown PLLC, the attorneys for Ramona Moix–McNutt ("Debtor"), should be sanctioned pursuant to various provisions of the Bankruptcy Code. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A), and the Court has jurisdiction to enter a final judgment in the case.

On July 14, 1997, this Court issued its Order for R.J. Brown ("Brown") and C. Richard Crockett ("Crockett") of Crockett & Brown to appear and show cause why they should not be sanctioned pursuant to Federal Rule of Bankruptcy Procedure 9011. On December 5, 1997, this Court issued a supplemental Order requiring Brown to appear and show cause why he should not be sanctioned under sections 105(a) and 329 of the United States Bankruptcy Code for advising and assisting the Debtor in the preparation of a false and misleading petition and schedules; the unauthorized post-petition transfer of real estate, which was property of the estate; the unauthorized transfer of estate money to the Debtor's husband; and the unauthorized payments of pre-petition claims to an insider of the Debtor. At both show-cause hearings Brown appeared in person and by counsel, and in both instances he declined the Court's invitation to present evidence justifying his actions. Crockett also appeared at the first hearing and declined to offer evidence.

## I

### THE FALSE PETITION

The Debtor's petition and schedules were prepared from information provided by or at the direction of the Debtor and the case was originally filed under the provisions of chapter 13 of the United States Bankruptcy Code on January 2, 1997. The schedules filed February 18, 1997, listed unsecured claims totaling $233,358.80 and secured claims totaling $660,527.17. Crockett signed the bankruptcy petition, and Crockett, Brown, and Crockett & Brown PLLC are listed as attorneys for the Debtor.

At a trial on June 26, 1997, both the Debtor and her husband acknowledged that they were both personally liable for an unscheduled claim owed to Conway Water Improvement District Number Ten in the approximate sum of $208,000.00. The Debtor admitted that the debt was liquidated but

did not mature until October 1998. Hibernia National Bank of Texas ("Hibernia"), as Trustee for the owner of the improvement bonds, filed a claim on January 5, 1998, for $208,845.00, reserving the right to an additional 25% penalty, attorney's fees, and costs. Hibernia's claim states that the sum became delinquent October 10, 1997, and now constitutes a lien against real property owned by the Debtor and her husband.

The Debtor stated the following in response to questions by the Court:

Q I don't see an improvement district listed as a creditor. Maybe I overlooked it.

A I don't believe it is.

Q Well, why would it not be listed as a creditor?

A I asked if I needed to include that and I was told no.

Q By whom?

A By my attorneys.

(Tr. at 76; June 26, 1997 hearing.)

Mark McNutt, the Debtor's husband, testified that the improvement district had come into being two years previously and that the $208,000.00 assessment was for the year 1996 and would be due in approximately one year. He also stated that he had known for at least six months prior to the June 26, 1997 hearing that this amount was due. Thus, both he and the Debtor knew of this noncontingent, liquidated debt prior to the filing of the bankruptcy petition on January 2 and the completion of the Debtor's schedules filed February 18.

■ Only debtors with noncontingent, liquidated, unsecured indebtedness of less than $250,000.00 and noncontingent, liquidated, secured indebtedness of less than $750,000.00 are eligible for chapter 13 relief. 11 U.S.C. § 109(e) (1994). Debtors seeking relief under the Bankruptcy Code must file a list of creditors and, unless the court orders otherwise, a schedule of assets and liabilities. 11 U.S.C. § 521(1) (1994). Intentional failure to list a creditor is grounds to deny the Debtor a discharge and may constitute a crime. 11 U.S.C. § 727(a)(4) (1994); 18 U.S.C. § 152(2) & (3) (1994); *In re Shebel,* 54 B.R. 199, 202 (Bankr.D.Vt.1985) (failure to list a creditor on schedules may constitute a false oath un-

der section 727(a)(4)(A)); *In re Schnabel,* 61 F.Supp. 386, 387 (D.Minn.1945) (objection to discharge was sustained for intentional omission of creditors).

The definition of a claim is a "right to payment whether or not such right is ... liquidated, unliquidated, fixed, contingent, matured, unmatured...." 11 U.S.C. § 101(5) (1994). The record establishes that the improvement district had such a claim on the date the petition was filed.

According to the Debtor's testimony, Brown was fully aware of this claim of more than $200,000.00 for improvements to the Debtor's property. The Court accepts the Debtor's testimony that she informed counsel of the indebtedness and was told that she was not required to schedule the claim. Even after the omission of this creditor was disclosed on the record, Crockett & Brown failed to amend the schedules. The incentive to omit this creditor is obvious. If the omitted creditor had been properly scheduled, any argument that the Debtor is eligible for chapter 13 would have been patently frivolous because the Debtor's debts exceeded the limitations set by 11 U.S.C. § 109(e) (1994).

## II

### THE UNAUTHORIZED TRANSFERS

The Debtor's schedules reflect that she and her husband were the owners of a dwelling located at 1808 Independence, Conway, Arkansas, valued at $38,500.00. The petition listed Kirk and Marilyn Moix as the creditors, and under the heading "nature of lien" the schedules provided "purchase of property."

The Debtor testified that this real property was sold in April 1997, several months after the bankruptcy petition was filed. She said that she contacted Brown and "told him that ... we were ... ready to close out. And he told me to go ahead and close it out and then to send the check to him." (Tr. at 70, hearing June 26, 1997.)

The following were the Debtor's answers to the Court's inquiry into the transfer of the real property in question:

Q What happened to the money, the proceeds from the sale of that property?

A Mr. Brown has the check

. . .

Q For how much?

A Thirteen hundred and—. I'm not aware of the exact amount,

Q Was the property encumbered?

A Yes.

Q Who held the mortgage?

A My brother.

Q Was he paid?

A Yes.

Q Did you deliver a deed in April to the purchaser?

A Yes.

Q And they delivered you a check?

A Yes.

Q And this was pursuant to a contract for sale?

A Yes.

MR. BROWN: Your—

THE COURT: You can ask her about it in a minute.

MR. BROWN: Yes, sir.

Q Do you know that you're not supposed to do that without Court permission? Were you told?

A Well, yes, and I asked Mr. Brown several times what I needed to do in order to do this, or if I could do this, and I was instructed to go ahead and let the deal close.

(Tr. at 70–72, hearing June 26, 1997.)

The attorney for the Standing Chapter 13 Trustee then asked the Debtor the following:

Q And what was the lien that your brother had on the property?

A Thirty-one thousand something.

Q And the net proceeds only totaled one thousand three hundred and some odd dollars?

A Um-hm.

Q Do you know what happened to the difference?

A Expenses for getting the house ready for sale, and he wanted things corrected that needed to be corrected.

(Tr. at 81–82, hearing June 26, 1997.)

The attorney for Ford Motor Credit Company then asked the Debtor the following:

Q You've said the check, Debtor's Exhibit 1, was the net proceeds that you received from the sale of the house?

A Yes.

Q What do you mean by the net proceeds?

A Well, you have your sales price, you have your expenses, and what's left over is your net.

Q Did you or your husband receive any of the proceeds from the sale of the house besides the check that's been introduced as Debtor's Exhibit 1?

A My husband did.

Q How much?

A I don't recall.

Q Did he get the $6,000.00 difference between the sale price, Defendant's Exhibit 1, and the mortgage?

A No, I don't ever recall seeing a $6,000.00 check.

Q So your husband received payment for making the improvements to the house?

A I believe so.

Q Out of the proceeds from the sale of the house.

A Yes.

Q But you don't know how much that was?

A No, sir, I don't recall.

Q Do you have any idea?

A I couldn't venture a guess on that.

(Tr. at 85–86, June 26, 1997 hearing.)

The Court then asked the following questions of the Debtor:

Q What did you do with the money that your husband received out of the closing of the transaction in April? Did he put it in a bank account?

A $1200.00? $1500.00? Somewhere in that range.

Q   What types of repairs did that include?

A   Leaky roof, hole in the floor, replaced a floor joist, straightened up some posts.

Q   Did you pay for those repairs?

A   I paid for some and did some.

Q   Were you reimbursed for those repairs that you did?

A   Right.

Q   How much were you reimbursed?

A   That's the amount I just told you.

Q   The twelve hundred?

A   Well, I don't remember exactly what the check was.

(Tr. at 92–94, June 26, 1997 hearing.)

The attorney for Ford Motor Credit Company asked Mark McNutt the following with regard to the sale of the real property:

Q   I just want to be sure that I understand what happened on the sale of 1808 Independence.   Did you testify that you deducted the repair costs from the proceeds?   And then what was left over, you split with your wife?

A   That's correct.

Q   Who made the check—who drew the check for the repairs?

A   The closing company.

Q   Who was the check payable to?

A   To me, Mark McNutt.

Q   No one else?

A   No one else.

Q   And then was there another check payable jointly to you and Ramona?

A   I believe there was a check, right, to us. I'm not 100% sure.

Q   What happened to that check?

A   To what check?

Q   The one that was payable jointly to you and Ramona?

A   If there is one that's payable to us together, that's the one we sent to Mr. Brown.   I'm try—

Q   I thought you testi—.  Go ahead.

A   I thought—.   I'm trying to remember. I thought there was a check to me and a check to her for half, half and half.   If there was a check.

Q   Were there two checks to you?

A   There were two checks to me, right.

Q   One for the repairs.

A   No, sir.

Q   What did he do with it?

A   He stuck it somewhere where I couldn't see it so I wouldn't be able to spend it.

Q   Converted it to cash, I assume?

A   I assume so.

Q   Well, weren't you told not to do that?

A   To sell the property?

Q   No, to convert—.  Well, yes, to sell property, but also to keep cash hidden during your bankruptcy?

A   No.

Q   You've not ever been told that?

A   No.

Q   Why would he hide cash from you?

A   Because he thinks I spend money like water, which I don't, but he thinks I do.

Q   Was he hiding it from you or from me?

A   From me.

Q   From you.

A   If he was hiding it.   I'm not saying he was hiding it.   I'm just saying he didn't want me to spend it.

(Tr. at 88–89, June 26, 1997 hearing.)

The attorney for the Standing Chapter 13 Trustee asked Mark McNutt the following with regard to the sale of the real property:

Q   Do you remember how much you were paid when that property was sold?

A   You mean gross or net or—

Q   Gross.

A   Gross.   About—.   The check I actually saw?

Q   Yes.

A   $1350.00.

Q   And what happened to that check?

A   We gave it to our attorney.

Q   What was the purpose of giving it to the attorney?

A   That's what he told us to do.

Q   Did you receive any other funds in this transaction?

A   Yes.

Q What funds were those?

A For repairs done on the house to consummate the sale,

Q How much were those funds?

A Right.

Q One for your half of the remainder.

A Right.

Q And then the other check was to Ramona.

A That's the way I recall it.

Q And the one that Ramona received, you forwarded directly to—

A Mr. Brown.

Q —Mr. Brown. Who else received proceeds from the sale of the house?

A To pay off the mortgage, I guess the closing company, the termite company, probably Faulkner County, the taxes. That's all I recall.

(Tr. at 105–107, June 26, 1997 hearing.)

The Attorney for Mercantile Bank then asked Mark McNutt the following questions about the real property.

Q Mr. McNutt, I apologize, I was confused earlier. I thought you had received one check at closing. And is it your testimony you got two checks at closing?

A When you say me, you mean just me?

Q Yes, sir, made payable to you.

A Right.

Q You got two checks.

A Two checks.

Q One was for repairs plus labor?

A Right.

Q And how much that was check? [sic]

A I believe the two checks, I think one was seventeen hundred and that was for repairs; and the other was for thirteen hundred and fifty, I believe, which would have been my half interest.

Q So you received two checks in the approximate total amount of $3,050.00 from the closing. Is that right?

A I believe that's correct.

Q Now did you cash both of those checks?

A That's correct.

Q And you put all that cash in your pocket, or not into an account.

A That's correct.

Q Thank you.

(Tr. at 108, June 26, 1997 hearing.)

The commencement of a case in bankruptcy creates an estate comprising all the debtor's legal or equitable interests as of the commencement of the case. 11 U.S.C. § 541(a) (1994). The trustee or debtor in possession may sell property of the estate only after notice and a hearing, unless the sale is in the ordinary course of business. 11 U.S.C. § 363(b)(1) (1994). When property of the estate is to be sold free and clear of liens, a motion pursuant to Federal Rule of Bankruptcy Procedure 9014 is required. Fed. R.Bankr.P. 6004(c). *See* 3 Collier on Bankruptcy ¶ 363.02 (Lawrence P. King et al. eds., 15th ed.1993) (discussing generally the need for authorization to sell property of the estate).

Courts have devised two discrete tests for determining whether a sale is made in the ordinary course of business. Under the horizontal dimension test, the question is whether the sale is a transaction that similarly situated businesses commonly enter into. *Burlington Northern R.R. Co. v. Dant & Russell (In re Dant & Russell)*, 853 F.2d 700, 704 (9th Cir.1988). The reasonable expectation test asks whether this is a transaction interested parties would expect the debtor or trustee to enter into in the normal course of business. *In re Dant & Russell*, 853 F.2d at 705; *Worthen Bank & Trust Co. v. Hilyard Drilling Co., (In re Hilyard Drilling Co.)*, 74 B.R. 5, 6 (W.D.Ark.1986).

■ The Debtor, who described her occupation as that of a nanny/babysitter earning approximately $100.00 a month, is not in the business of buying and selling residences. Thus, under either the horizontal or reasonable expectations test, the facts in this case do not support any non-frivolous argument that the sale in question was in the ordinary course of business of the Debtor. The applicable provisions of the Bankruptcy Code notwithstanding, Brown advised the Debtor that it was permissible to sell property of the estate free and clear of liens and make distri-

bution of the proceeds without the proper motion, without any notice to creditors, and in clear violation of the restrictions of section 363.

The proceeds of the sale were delivered not only to the Debtor's brother-in-law, who was a scheduled creditor, but a portion of the proceeds was transferred to the Debtor's husband, who was not scheduled as a creditor. When afforded an opportunity to explain or justify his advice to his client, Brown remained silent.

### III

### SANCTIONS

Federal Rule of Bankruptcy Procedure 9011 closely tracks the language and purpose of Federal Rule of Civil Procedure 11. The Rule provides in parts relevant to the facts of this case that "[e]very petition, pleading, motion and other paper served or filed in a case under the Code ... except a list, schedule or statement ... shall be signed by an attorney of record...." Fed.R.Bankr.P. 9011. That signature certifies that the document is well grounded in fact and warranted by existing law or a good faith argument for the extension, modification or reversal of existing law and that it is not interposed for any improper purpose. Fed.R.Bankr.P. 9011.

■ The Bankruptcy Court is empowered to impose sanctions on an attorney for violations of Rule 9011. *See, e.g. Grunewaldt v. Mutual Life Ins. Co. (In re Coones Ranch, Inc.),* 7 F.3d 740, 743 (8th Cir.1993); *Brown v. Mitchell (In re Arkansas Communities, Inc.),* 827 F.2d 1219, 1221–22 (8th Cir.1987); *In re Heard,* 106 B.R. 481, 484 (Bankr. N.D.Ohio 1989); *In re Nesom,* 76 B.R. 101, 102 (Bankr.N.D.Tex.1987). Moreover, the rule itself mandates the imposition of an appropriate sanction when a document is signed in violation of the Rule. Fed. R.Bankr.P. 9011; *In re Heard,* 106 B.R. at 484.

■ Crockett and Brown violated Bankruptcy Rule 9011 when they filed the subject bankruptcy petition under the provisions of chapter 13 with full knowledge that the Debtor is ineligible for such relief because of the debt limitations of section 109(e). They also violate Rule 9011 when they deliberately omitted a significant creditor from the schedules to conceal the Debtor's lack of eligibility for relief under chapter 13.

Brown is an experienced attorney with considerable experience in the field of bankruptcy law. He has appeared in numerous bankruptcy cases in this Court, including many complex chapter 11 cases. He has also incurred sanctions from this Court and other Courts for inappropriate conduct. *See Brown v. Mitchell (In re Arkansas Communities, Inc.),* 827 F.2d 1219 (8th Cir.1987) (affirming Rule 9011 sanctions against Brown for filing frivolous pleadings in bankruptcy court); *Buffington v. First Service Corp.,* 672 F.2d 687 (8th Cir.1982) (assessing Brown double costs for filing frivolous appeal); *In re Ragar,* 140 B.R. 889 (Bankr.E.D.Ark.1992) (fining Brown $950 for contempt of court for refusing to obey order of disqualification), *aff'd sub nom. Brown v. Ramsay (In re Ragar),* 3 F.3d 1174 (8th Cir.1993); *Davis v. Davis,* 291 Ark. 473, 725 S.W.2d 845 (1987) (concluding that Brown committed fraud on the court by submitting incorrect judgment); *Crockett & Brown v. Wilson,* 321 Ark. 150, 901 S.W.2d 826 (1995) (sanctioning Crockett & Brown $15,000.00 for violation of Rule 11).

Crockett also has years of legal experience and likewise has incurred sanctions for filing frivolous pleadings. *See, e.g., Landscape Properties, Inc. v. Whisenhunt,* 127 F.3d 678 (8th Cir.1997) (affirming the district court's imposition of Rule 11 sanctions totaling $36,-167.21 for filing a frivolous complaint).

In certain instances, an attorney's representation in the Bankruptcy Court is subject to the control of the Bankruptcy Court. *See, e.g.,* 11 U.S.C. § 328 (1994) (court may alter or deny fees to professional persons employed under section 327); 11 U.S.C. § 329 (debtor's attorney must file statement of compensation with the court and such compensation is subject to cancellation by the court); 11 U.S.C. § 330 (court may award reasonable compensation and expense reimbursement to attorneys employed under section 328).

In addition, the Bankruptcy Court has authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11] .... or to prevent an abuse of process." 11 U.S.C. § 105(a) (1994). Numerous cases support the authority of the bankruptcy courts to sanction attorneys by suspension and disbarment under section 105(a). *D.H. Overmyer Co., Inc. v. Robson,* 750 F.2d 31, 33 (6th Cir.1984) (affirming revocation of attorney's pro hac vice status for failing to comply with court rule regarding disclosure of conflicts); *In re Statmore,* 176 B.R. 512, 515 (D.Neb. 1994) (affirming suspension of attorney from practice before the bankruptcy court where attorney failed to pay under disgorgement order); *In re Assaf,* 119 B.R. 465, 467 (E.D.Pa.1990) (affirming suspension of attorney from practice in bankruptcy court until his fees were remitted to mortgagee); *In re Heard,* 106 B.R. 481, 484 (Bankr.N.D.Ohio 1989) (suspending attorney for one year for making a series of bad faith filings on his own behalf); *In re Nesom,* 76 B.R. 101, 102 (Bankr.N.D.Tex.1987) (suspending attorney for 60 days for forging debtor's signature on schedules); and *In re Lowe,* 18 B.R. 26 (Bankr.N.D.Ga.1982) (suspending lawyer from practice in bankruptcy court for continued violation of rules and noncompliance with orders).

Because of the experience of the attorneys involved, the basic nature of the applicable bankruptcy rules and statutes, and the attorneys' failure to offer any explanation for their conduct, the facts point to a single conclusion: the decision to omit the creditor and the decision to sell the real property were made intentionally with willful disregard for the bankruptcy rules and law.

The successful application of the provisions of the Bankruptcy Code depends in part on the integrity of those attorneys who represent debtors. Debtors rely on their attorneys for legal advice in order to faithfully complete the duties imposed upon them. The submission of accurate, complete schedules are required by the Code. 11 U.S.C. § 521(1) (1994). Brown, in particular, has proven by his conduct in this case and his history of misconduct in previous cases that he cannot be depended upon to faithfully perform the duties of an attorney representing a debtor under any chapter of the Bankruptcy Code in this Court. Furthermore, this is Brown's third offense before this Court. Stringent sanctions are warranted.

Therefore, for violation of Federal Rule of Bankruptcy Procedure 9011 and pursuant to 11 U.S.C. § 105(a), the following sanctions are imposed:

1. Crockett & Brown PLLC is assessed a fine of $5,000 for deliberately filing a false and misleading bankruptcy petition, pursuant to Federal Rule of Bankruptcy Procedure 9011.

2. Brown and Crockett & Brown PLLC are ordered to file within ten (10) days a full accounting of the money disbursed by the Debtor in the real estate transaction described herein and shall reimburse the estate all monies distributed to unscheduled creditors.

3. Brown is removed as attorney for the Debtor in this case and he shall not be allowed any fee for services rendered in this case. Crockett & Brown PLLC is removed from this case and shall not be allowed any fee for services rendered in this case.

4. Brown and Crockett & Brown PLLC are suspended from representing Debtors under any chapter of the Bankruptcy Code in the Eastern or Western District of Arkansas for a period of four (4) years from the date of this order.

IT IS SO ORDERED.