**In re Stephen M. KING d/b/a Global Capital Resources, Debtor.**

**The Cadle Company, Plaintiff,**

**v.**

**Stephen M. King d/b/a Global Capital Resources, Defendant.**

Bankruptcy No. 00–02231–M.
Adversary No. 00–0228–M.

United States Bankruptcy Court,
N.D. Oklahoma.

Jan. 16, 2002.

Bruce Klein, Oklahoma City, OK, for plaintiff.

Greggory Colpitts, Tulsa, OK, for defendant.

## *MEMORANDUM OPINION*

TERRENCE L. MICHAEL, Bankruptcy Judge.

THIS MATTER came before the Court for trial on November 29, 2001, on the Complaint Objecting to Debtor's Discharge (the "Complaint") filed by The Cadle Company, Plaintiff herein ("Cadle" or "Plaintiff"). Cadle appeared through its attorney, Bruce F. Klein. Stephen M. King ("King" or "Debtor") appeared personally and through his attorney, Greggory T. Colpitts. The Court received evidence and heard argument from the parties. The Court also considered the facts stipulated to by the parties in the Amended Pre–Trial Order filed in this action on July 31, 2001. The following findings of fact and conclusions of law are made pursuant to Bankruptcy

Rule 7052 and Federal Rule of Civil Procedure 52.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[1] Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(J).

## Burden of Proof

Cadle asks the Court to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(3), (a)(4)(A) or (a)(6)(A). The plaintiff has the burden of proof on a complaint objecting to discharge. *See* Fed.R.Bankr.P. 4005. In order to prevail, Cadle must prove each element of § 727(a)(2)(A), (a)(3), (a)(4)(A) or (a)(6)(A) by a preponderance of the evidence. *See In re Serafini*, 938 F.2d 1156, 1157 (10th Cir.1991); *cf. Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Once the objecting creditor establishes a *prima facie* case for denying the debtor's discharge under § 727, the burden of going forward shifts to the debtor. *See Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 619 (11th Cir.1984); *In re Wang*, 247 B.R. 211, 214 (Bankr.E.D.Tex.2000). The ultimate burden, however, rests with the creditor. *See First Union Nat'l Bank v. Golob (In re Golob)*, 252 B.R. 69, 75 (Bankr.E.D.Va.2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir.1994)). "Consistent with the 'fresh start' policy underlying the Code, [objections] to discharge should be construed strictly against the creditor and liberally in favor of the debtor." *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996).

---

**1.** Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 2002).

## Findings of Fact

In order to understand the basis for the Court's decision, some history of the Debtor's business activities is necessary. Prior to 1991 the Debtor enjoyed a fairly successful career in commercial real estate. The Debtor estimated that he spent fifteen to seventeen years assisting the Wal–Mart Corporation ("Wal–Mart") in identifying and purchasing locations for its retail stores in the United States. Sometime in 1990 or 1991, Wal–Mart sought his help in finding and obtaining suitable sites in Mexico. The Debtor testified that Wal–Mart soon abandoned those plans and terminated his services, an event that contributed substantially to his financial distress.

Sometime after his termination by Wal–Mart, the Debtor became the part-owner and the only employee of Global Capital Resources, L.L.C., ("Global") a company formed for the purpose of providing consulting services in the fields of commercial real estate and finance to clients based in Mexico, the same enterprise that Debtor had conducted in one form or another since 1991. The Debtor has yet to successfully complete a transaction in Mexico and has received no income from the consulting service save for a referral fee of between $7,000 and $9,000 that he received shortly before one of his proposed projects collapsed.

On June 27, 1994, Midstates Resources Corporation ("Midstates") obtained a judgment (the "Judgment") against the Debtor in the District Court in and for Tulsa County, Oklahoma. After extending the Judgment several times in the years following its issuance, Midstates assigned the Judgment to Cadle in early 2000. Cadle sought to enforce the Judgment by garnishing the Debtor's wages and bank accounts. These collection efforts eventually took their toll.

In 1997 the Debtor began receiving funds from Stephen E. Jackson ("Jackson"), a former business associate. The transfers were made by checks either from Jackson or his investment company to the Debtor in amounts ranging from $1,500 to $6,000. *See Plaintiff's Exhibit No. 16.* Jackson testified that the transfers were intended to help the Debtor make ends meet while he continued to try to put together commercial real estate deals. Jackson and the Debtor did not execute a promissory note or security agreement relating to the transfers. They also never established a repayment schedule or set a limit on the amount of money Jackson was to provide to the Debtor. Jackson ceased transferring funds to the Debtor in May 2000. He estimated that his transfers to the Debtor totaled slightly more than $100,000.

In 1998 the Debtor also began receiving transfers of funds from L. Thomas Lay ("Lay"), a commercial real estate broker and the other co-owner of Global. Copies of a number of checks from Lay to the Debtor were received into evidence. The checks range in amount from $450 to $3,000, and the words "personal loan" are written on the memo line of each of the checks admitted. *See Plaintiff's Exhibit No. 13.* Lay testified that the payments began when the Debtor came to him seeking funds in order to close a real estate transaction, and continued until the spring of 2001. In exchange for advancing the funds, Lay was to receive a portion of the proceeds from the transaction when it closed. The real estate transaction fell through, but Lay continued providing funds to the Debtor in the hopes that the Mexican ventures would eventually bear fruit. Lay estimated he provided a total of approximately $50,000 to the Debtor. A 1998 Internal Revenue Service Form 1099 issued to the Debtor reflects $8,000 in nonemployee compensation received by the

Debtor from Lay's realty company during the year. *See id.* The Debtor testified that the 1099 Form was issued to reflect the funds he received from Lay during 1998. There is no security agreement or promissory note reflecting any repayment agreement between Lay and the Debtor. At the time of trial, the Debtor had not repaid any of the funds he received from either Jackson or Lay.

Debtor filed for chapter 7 bankruptcy relief on June 19, 2000. Concurrent with the filing of his bankruptcy petition, the Debtor filed his Schedules (the "Schedules") and Statement of Financial Affairs (the "Statement"). He acknowledged that he executed each of these documents under penalty of perjury. He also testified that they were initially prepared approximately eighteen months before they were filed, and that he gave them a cursory review before filing. This review resulted in only a few minor changes to the schedules and Statement. The Debtor did not list any of the monies received from Jackson and Lay in his Statement. He listed no income in his Schedule I statement of current income, despite the fact that he received at least $1,000 from Lay in June 2000, the month he filed his bankruptcy petition. He did not list Jackson or Lay as creditors in his bankruptcy Schedules. Although the Debtor also owes money to his mother and former father-in-law, he did not list either as a creditor in his Schedules.

The Debtor indicated in his Statement that no financial accounts held in his name were closed within a year of his bankruptcy filing. *See Plaintiff's Exhibit No. 3.* This statement was not correct. There were in fact two such accounts. One account was held in the name of the Debtor and his then wife and was closed in August 1999. The other was held in the Debtor's name for use by his child's youth baseball team, which the Debtor helped coach. This account was closed in March 2000.

Similar inaccuracies are found in the Schedules. On his Schedule J (Statement of Expenses), the Debtor listed a $500 monthly installment payment for "estimated federal income tax" and a $250 monthly installment payment for an automobile. The Debtor testified that he was not making any tax payments at the time he filed his bankruptcy petition, and that he did not own an automobile. Additionally, the Debtor testified that he owns approximately 41,000 shares of stock in a company known as Omega Development ("Omega"), which he claims are worthless. He did not list the stock among his assets. Some time prior to the filing of the Debtor's bankruptcy petition, his mortgage lender foreclosed on his home. The Debtor did not disclose the foreclosure in his Statement.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Cadle contends that grounds exist to deny the Debtor's discharge under § 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(6)(A) of the Bankruptcy Code (the "Code"). The Court finds, for the reasons set forth below, that the Debtor's discharge should be denied under § 727(a)(4)(A). Accordingly, the Court does not reach the issues arising under §§ 727(a)(2)(A), (a)(3), or (a)(6)(A). *See Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 177 (5th Cir.1992).

Section 727(a)(4) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

§ 727(a)(4)(A). The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

*In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted). The Fourth Circuit has held that

> In order to be denied a discharge under this section [§ 727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made

by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.

*Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir.1987) (citations omitted); *see also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision, a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4). *See In re Calder*, 907 F.2d 953, 955 (10th Cir.1990). Similarly, the "[i]ntentional failure to list a creditor is grounds to deny the Debtor a discharge and may constitute a crime." *In re Moix–McNutt*, 220 B.R. 631, 633 (Bankr. E.D.Ark.1998) (citations omitted). Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case." *Calder*, 907 F.2d at 955–956.[2]

**2.** Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2). The United States Court of Appeals for the Seventh Circuit has held that

> To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is

implied. The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct. Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted); *see also Kaler v. Olmstead (In re Olmstead)* 220 B.R. 986, 994 (Bankr.D.N.D.1998) (quoting *Yonikus*); *see also Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr.N.D.Ill.1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

Cadle argues that the Debtor knowingly and fraudulently made a false oath when he: (1) failed to list the monies received from Jackson and Lay as income (2) failed to list Jackson, Lay, his former father-in-law and his mother as creditors; (3) failed to list the Omega stock as an asset; (4) failed to provide information regarding the two bank accounts; (5) failed to disclose the foreclosure of his home; and (6) inflated his monthly expenses by listing the income tax payments and automobile payments. The Court will examine each contention in turn.

*Payments from Jackson and Lay*

In this case, the Debtor indicated that he received no gross income pre-bankruptcy during calendar year 2000. He listed $10,200 in gross income for 1999 and $30,750 for 1998. The Debtor received transfers of funds from both Jackson and Lay during the relevant time periods, but did not include those funds in the gross income identified in the Statement. The Debtor alternately described the transfers from Jackson and Lay as loans or gifts from friends that were intended to help him through a difficult financial period. His testimony in this regard was less than consistent. During a 2004 examination conducted in September 2000, the Debtor referred to the transfers as loans. At trial he reversed course somewhat and repeatedly characterized the payments as gifts. In any event, the Debtor argues, he was not obligated to disclose the transfers in his bankruptcy documents because he did not consider the funds to be income.

 Item 1 in the statement of financial affairs requires debtors to list the "gross amount of income . . . received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced." Debtors must also list gross income received from such sources during the two years immediately preceding the calendar year in which the case was commenced. While Item 1 speaks in terms of gross income, Item 2 in a debtor's statement of financial affairs is worded differently. It requires debtors to state the amount of *income* received from sources other than those mentioned in Item 1 during the two years immediately preceding the bankruptcy case. In response to this inquiry, the Debtor marked "none." The instructions for Item 2 provide in pertinent part:

> All other income, other than from employment, trade, or profession, or from operation of the debtor's business, that the debtor received during the two years before the commencement of the case should be disclosed under item 2. This category may include, but is not limited to, income tax refunds, Social Security and other public benefit payments, alimony, child support, interest, dividends, pensions, annuities, capital gains, money judgments from lawsuits, royalties, licenses, rents, leases, and subleases.

*Instructions for Completing Official Forms, Statement of Financial Affairs, Art. III, ¶ 2* (West 2001). The inclusion of items such as income tax refunds and child support payments make it clear that "income" for purposes of Item 2 is intended to reach many distributions beyond the scope of Item 1.

 The Code does not define the phrase "gross income" or the word "income." Bankruptcy courts have frequently turned to tax law for assistance in defining such terms. *See e.g., In re Gregerson*, 269 B.R. 36, 40 (Bankr.N.D.Iowa 2001). The Seventh Circuit has held that the term "gross income" as it appears in the Code should be interpreted in accordance with the Internal Revenue Code ("the Tax Code"). *In re Wagner*, 808 F.2d 542, 549 (7th Cir.1986). In *Wagner*, the court held

that distributions from an individual retirement account to a chapter 12 debtor constituted gross income for the purpose of determining whether the debtor fit the Bankruptcy Code's definition of a farmer and was therefore exempt from involuntary bankruptcy. The Court reasoned that using the Tax Code definition of the term would avoid the uncertainty that would be created if debtors or creditors were to decide for themselves what "gross income" means. *Id.* at 547; *see also, In re Lamb,* 209 B.R. 759, 760–61 (Bankr. M.D.Ga.1997) (Congress intended the term "gross income" to have its ordinary Tax Code meaning); *In re Van Fossan,* 82 B.R. 77, 79 (Bankr.W.D.Ark.1987) (citing *Wagner*); *In re Pratt,* 78 B.R. 277, 280 (Bankr.D.Mont.1987) (same). This approach has not received universal acceptance, however. Some courts have found the definition supplied by the Tax Code too rigid for application in bankruptcy cases. *See In re Gage,* 159 B.R. 272, 281 (Bankr. D.S.D.1993) ("income" for chapter 12 purposes not necessarily calculated or premised on Tax Code approach, but rather is determined subjectively based upon facts of each case); *In re Cochran,* 141 B.R. 270, 272 (M.D.Ga.1992) ("income" for purposes of § 1325(c) broader than definition found in Tax Code); *In re Martin,* 130 B.R. 951, 966 (Bankr.N.D.Iowa 1991) (income under disposable income test of § 1225(b) not determined by Tax Code); *In re Rott,* 73 B.R. 366, 371–72 (Bankr.D.N.D.1987) (rejecting *Wagner* court's emphasis on "simplicity and certainty" and considering circumstances of each case to promote "the flexible nature of the Bankruptcy Code,

and the objective of reaching just and equitable results for both parties.").[3]

The Court concludes that the definition of "gross income" contained in the Tax Code and adopted in *Wagner* and its progeny is preferable to the more flexible definition used by the courts in *Rott* and similar cases. The specificity and predictability of the Tax Code definition provides guidance to debtors regarding which receipts they must account for in their filing documents and which they may exclude. Utilizing the flexible, or subjective, definition, would foster confusion as debtors attempted to formulate their own guidelines and debtor's attorneys tried to adapt to the definitions adopted by various courts. Such an approach would seriously undermine one of the prime reasons for requiring debtors to file schedules and statements of affairs, that of "furnish[ing] the trustee and creditors with detailed information about the debtor's financial condition, thereby saving the expense of long and protracted examination for the purpose of soliciting the information." 4 *Collier on Bankruptcy* ¶ 521.09 at 521–34 (Lawrence P. King ed., 15th rev. ed.2001) (hereafter *Collier*) (footnote omitted). Furthermore, one of the primary justifications for rejecting the Tax Code definition—that it would exclude from the *disposable income* calculation items such as social security payments and gifts, *see Martin,* 130 B.R. at 965, is inapplicable here. The Court will therefore apply the Tax Code's definition of "gross income" to the Debtor's disclosures in Item 1 of his Statement and Schedule I of his petition.

---

**3.** The cases mentioned above which adopted a broader definition of income than the one found in the Tax Code were filed under either chapter 12 or chapter 13 of the Code. Many of the considerations driving those decisions are not applicable here. The question here is not whether the Debtor qualifies to file under a particular chapter, or whether the Debtor has

allocated all of his disposable income to payments under a plan, or whether disbursements to the Debtor should be paid directly to a chapter 13 trustee. Rather, the question is whether the transfers to the Debtor from Jackson and Lay constitute "gross income" or "income" as those terms appear in the bankruptcy schedules and statement of affairs.

### 1. The payments as gifts

Under the Tax Code, the definition of "gross income" is a broad one.[4] Gifts, with a few narrow exceptions, are not considered part of a taxpayer's gross income. *See* 26 U.S.C. § 102.[5] The Supreme Court has stated that a voluntary transfer of property from one person to another without compensation or consideration is not necessarily a gift under the Tax Code. *See Commissioner v. Duberstein*, 363 U.S. 278, 285, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). "[I]f the payment proceeds primarily from the constraining force of any moral or legal duty, or from the incentive of anticipated benefit of an economic nature, it is not a gift." *Id.* (internal quotes and citation omitted). A gift in the statutory sense proceeds from a "detached and disinterested generosity, out of affection, respect, admiration, charity or like impulses." *Id.* (internal quotes and citations omitted). "The proper criterion requires determination of the dominant reason for the transfer." *United States v. Kasynski*, 284 F.2d 143, 146 (10th Cir.1960). Further, the transferor's characterization is not determinative. The Court must conduct an objective inquiry to determine whether the transfer amounts in reality to a gift. *See Duberstein*, 363 U.S. at 286, 80 S.Ct. 1190.

Turning first to the transfers from Jackson to the Debtor, the Court finds that they do not qualify as gifts under *Duberstein*. Two of the earliest checks written by Jackson to the Debtor contain a notation that the payments were loans. Jackson testified that he provided the

---

4. The definition is found at 26 U.S.C. § 61, which reads as follows:

§ **61. Gross income defined**

(a) **General definition.**—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services, including fees, commissions, fringe benefits, and similar items;

(2) Gross income derived from business;

(3) Gains derived from dealings in property;

(4) Interest;

(5) Rents;

(6) Royalties;

(7) Dividends;

(8) Alimony and separate maintenance payments;

(9) Annuities;

(10) Income from life insurance and endowment contracts;

(11) Pensions;

(12) Income from discharge of indebtedness;

(13) Distributive share of partnership income;

(14) Income in respect of a decedent; and

(15) Income from an interest in an estate or trust.

26 U.S.C.A. § 61(a) (West Supp.2001).

5. The statute provides in pertinent part:

§ **102. Gifts and inheritances**

(a) **General rule.**—Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance.

(b) **Income.**—Subsection (a) shall not include from gross income—

(1) the income from any property referred to in subsection (a); or

(2) where the gift, bequest, devise, or inheritance is of income from property, the amount of such income.

Where, under the terms of the gift, bequest, devise, or inheritance, the payment, crediting, or distribution thereof is to be made at intervals, then, to the extent that it is paid or credited or to be distributed out of income from property, it shall be treated for purposes of paragraph (2) as a gift, bequest, devise or inheritance of income from property. Any amount included in the gross income of a beneficiary under subchapter J shall be treated for purposes of paragraph (2) as a gift, bequest, devise, or inheritance of income from property.

(c) **Employee gifts.**—

(1) **In general.**—Subsection (a) shall not exclude from gross income any amount transferred by or for an employee to, or for the benefit of, an employee.

26 U.S.C. § 102 (West 2001).

funds to the Debtor so that the Debtor could pay his bills while he continued pursuing commercial real estate deals. Jackson also expects the Debtor to eventually repay the funds. The Debtor and Jackson had very limited contact with each other between the late 1970s and 1997, when the transfers began. The Debtor recounted an incident several years ago wherein he paid Jackson a substantial commission on a real estate transaction even though he was not obligated to do so. This implies that Jackson felt a moral obligation to assist his former associate. Moreover, the Operating Agreement (the "Operating Agreement") governing Global's activities, which was executed in June 1999, contains the following provision:

> (i) The Members agree that Stephen Jackson will be paid $100,000.00 for his financial assistance during the pre filing [sic] date of the Articles of Organization. This amount will be an expense to the Company and will be paid from income received by the Company upon the completion of the Company's projects.

See *Plaintiff's Exhibit No. 12*, Operating Agreement, ¶ 9(i). No evidence was presented regarding what financial assistance Jackson provided during the period in question. It is interesting to note that the transfers from Jackson to the Debtor totaled just over $100,000 and that they ended abruptly in May 2000, shortly after that total was reached. If the transfers to the Debtor constitute the financial assistance mentioned in the Operating Agreement, they should have been disclosed as income, as the Operating Agreement ultimately treats the monies received by the Debtor as an expense of Global. Given these facts, the Court has difficulty finding that the transfers arose out of "detached and disinterested generosity, affection, respect, admiration, charity or like impulses."

The Court also concludes that the funds transferred from Lay to the Debtor were not gifts. Lay testified that he began providing funds to the Debtor at a time when the Debtor was close to closing a real estate transaction. According to Lay, he was to be permitted to "participate in the closing" in exchange for providing funds to the Debtor. Lay also testified that he and the Debtor had a "business relationship" with respect to Global and that he viewed the venture as a good investment. Indeed, the Operating Agreement lists Lay and the Debtor as "Members" in the organization. See *Plaintiff's Exhibit No. 12, Operating Agreement* at p. 1. The Operating Agreement also lists Lay as a fifty percent owner in the company, with a right to forty percent of the net profits and liability for forty percent of net losses. See *id.* at p. 1–a, ¶ 8. Lastly, Lay issued the Debtor the 1099 Form classifying $8,000 in transfers made in 1998 as nonemployee compensation. Although there was testimony that Lay and the Debtor had a social relationship, possibly leading one to infer that the transfers were made for charitable reasons, that evidence pales in comparison with evidence indicating Lay made the transfers with the hope of one day sharing in any profits generated by Global.

### 2. The payments as loans

The nonexclusive list of items contained in the Tax Code definition of "gross income" does not include loans. See 26 U.S.C. § 61 (West Supp.2001). Since its enactment, the "sweeping scope" of 26 U.S.C. § 61 and its statutory predecessors has been consistently emphasized by the Supreme Court. See *Commissioner v. Schleier*, 515 U.S. 323, 327–328, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995). Exclusions from income must be narrowly construed. See *id.* "Money received as a loan, however, does not qualify as income

to the taxpayer because the taxpayer incurs an obligation to repay the loan in full at some future date." *Twenty Mile Joint Venture, PND, Ltd. v. Commissioner,* 200 F.3d 1268, 1276 (10th Cir.1999); *see also, Moore v. United States,* 412 F.2d 974, 978 (5th Cir.1969) ("proceeds from a bona fide loan do not constitute income because whatever temporary economic benefit the borrower derives from the use of the funds is offset by the corresponding obligation to repay them."). Thus, if the transfers from Jackson and Lay to the Debtor were loans, the Debtor was not required to list the proceeds of those loans in his Schedules or Statement.

▬▬▬ In distinguishing between the proceeds of a loan and income, the following passage from a recent decision of the Ninth Circuit is instructive:

> [W]e have defined a loan as an agreement, either express or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree. In classifying a loan, we examine the transaction as a whole. The conventional test is to ask whether, when the funds were advanced, the parties actually intended repayment.
>
> However, courts have considered a number of other factors relevant in assessing whether a transaction is a true loan, such as: (1) whether the promise to repay is evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7)

whether the parties conducted themselves as if the transaction were a loan. *Welch v. Commissioner,* 204 F.3d 1228, 1230 (9th Cir.2000) (internal quotes and citations omitted). As previously noted, no security agreement, promissory note, or other document setting forth any terms or agreement between Jackson and the Debtor exists. No interest was charged, no repayment schedule was established, no collateral was given to secure payments, and no repayments were made. Jackson and the Debtor testified that they made no agreement as to the total amount to be advanced. The only evidence regarding any "terms" was provided by the Debtor, who testified that he plans to repay the funds only if he "wins the lottery" or closes one of his commercial ventures in Mexico. At the time the transfers began, the Debtor had been trying for six years to bring one of his Mexican projects to fruition without a single success. Given the Debtor's testimony, the Court finds it difficult to conclude that he had a reasonable prospect of repaying Jackson when the transfers occurred.

▬▬▬ Deposits in an individual's bank account are *prima facie* evidence of income. *See Welch,* 204 F.3d at 1230. The record contains numerous copies of deposit slips for bank accounts held in the Debtor's name and in the name of his company. The slips reflect deposits of checks written by Jackson to the Debtor. *See Plaintiff's Exhibits Nos. 7, 9 and 10.* These funds were used to pay the living expenses of the Debtor and his family. Additionally, Jackson wrote one check in the amount of $1,295 to pay King's tuition for a Dale Carnegie course. The course was billed to Jackson's business, American Central Gas Company. *See Plaintiff's Exhibit No. 15.* This raises in the Court's mind the question of whether the Debtor was providing services for Jackson or if

Jackson viewed the transfers as an investment in the Debtor's business venture. Each of these considerations weighs against a finding that the transfers from Jackson to the Debtor constitute a loan.

Other indicators, however, point in the opposite direction. The two checks from 1997 annotated with the word "loan" indicate that Jackson anticipated receiving repayment at some time in the future. Whether his failure to similarly annotate the subsequent checks to the Debtor resulted from an oversight or from some other cause is unknown. Jackson testified that he believes the Debtor will eventually repay him.

In determining whether a transaction created a true debtor-creditor relationship, the court is not bound by the label attached by the parties, but must look to the underlying economic substance of the transaction. *See Katz v. Commissioner,* 60 T.C.M. (CCH) 260 (1990). The inquiry requires a consideration of all the facts and circumstances. *See id.* When viewed in their totality, the facts and circumstances here do not support a finding that the transfers from Jackson to the Debtor constitute a loan or series of loans. The parties did not execute any of the documents that would normally evince the creation of a lender-borrower relationship. The Debtor, according to his own testimony, had at most a contingent liability to repay the funds. Not only was there no "credit limit" established, but Jackson was uncertain at the time of trial precisely how much he had advanced to the Debtor during the relevant period. Evidently he placed no more priority on repayment than did the Debtor. Given the casual attitude with which both parties approached the transactions, it is difficult to say they treated them as true loans. Jackson's testimony at trial that he believes the Debtor will repay him sheds little light on what he thought when he was making the transfers. Then there is the Operating Agreement, which provides that Jackson will be paid $100,000 for his "financial assistance." As noted above, this provision places the repayment obligation squarely on the Debtor's company, Global, rather than on the Debtor himself. Furthermore, the fact that the transfers were made at fairly regular intervals in similar amounts, were deposited in the Debtor's bank accounts and were used to pay the daily expenses of the Debtor and his family reinforces the Court's conviction that they constitute income and should have been disclosed in the Debtor's schedules and Statement.

Many of the same facts pertain to the funds received by the Debtor from Lay. There was no promissory note or similar document reflecting any agreement. There was no interest rate or repayment schedule, just the Debtor's repeated insistence that he was obligated to repay the funds only if he won the lottery or closed one of his eternally elusive Mexican deals. As was the case with the Jackson advances, at least some of the funds obtained from Lay found their way into the Debtor's bank accounts and were used to pay his family's living expenses. *See Plaintiff's Exhibit No. 10.* Although the parties never agreed on the total amount of funds Lay was to transfer to the Debtor, Lay testified that they had discussed establishing a fixed monthly payment in the neighborhood of $2,000. The Debtor listed his gross monthly income as $1,500 on a child support computation filed August 1, 2000, in the state court which presided over his divorce proceeding. At trial, the Debtor stated that he listed that amount because Lay was providing him with approximately $1,500 per month at the time. The Debtor said he listed the funds as income solely to save his ex-wife the expense of paying child support to him.

Advances made at regular intervals for a fixed or nearly fixed amount look suspiciously like compensation. The fact that Lay issued a 1099 Form to the Debtor for the funds advanced in 1998 provides circumstantial evidence that the subsequent transfers were also intended as nonemployee compensation.[6] The Operating Agreement contains the following paragraph:

> (h) Prior to the first closing and/or the receipt of any retainer fees relating to the Company's projects, L. Thomas Lay shall be responsible for travel expenses, legal expenses, and any general operating expenses incurred by and/or on behalf of the Company. All expenses incurred, as well as those funds advanced by L. Thomas Lay to Stephen M. King, including funds disbursed on Mexican related business is to be reimbursed to L. Thomas Lay from incomes received by the Company. These advances are to be expensed by the Company in order to determine the net income available for distribution to the Members.

*See Plaintiff's Exhibit No. 12* at p. 2–3, ¶ 9(h). This provision appears to contemplate that even in the unlikely event that one of the Debtor's Mexican projects were to succeed, Lay, like Jackson, was to be repaid from *company funds*, not from the Debtor's personal funds. While it is true that each check from Lay to the Debtor bears the notation "personal loan," it is also true that as of the time of trial, none of the funds had been repaid and Lay had apparently taken no steps to collect. Moreover, the Debtor testified that he believes Lay called the distributions loans chiefly to enable the Debtor to escape paying taxes on them.

"For disbursements to constitute true loans there must have been, at the time the funds were transferred, an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment." *Geftman v. Commissioner,* 154 F.3d 61, 68 (3rd Cir.1998) (quoting *Haag v. Commissioner,* 88 T.C. 604, 615–16, 1987 WL 49288 (1987), *aff'd,* 855 F.2d 855 (8th Cir. 1988)) (internal quotes omitted). In the absence of direct evidence of intent, the Court may infer the nature of the transaction from its objective characteristics. *See Geftman* 154 F.3d at 68. Assuming, *arguendo,* that Lay intended to seek repayment from the outset, it seems clear that at no time during the nearly two years that the transfers occurred did the Debtor have an unconditional obligation to repay the funds. As noted in the discussion of the Jackson transfers, the Debtor's obligation to repay the funds was dependent on the slim chance that he successfully concluded one of his Mexican projects or "won the lottery." And even if he did complete one of the commercial projects, the obligation to repay was Global's and not the Debtor's. Furthermore, the objective characteristics of the parties' arrangement—the absence of debt instruments, repayment schedules and the like—are not indicative of an unconditional obligation on the Debtor's part.

■ Either the transfers constituted gross income received from employment or operation of the Debtor's business and should have been listed in Item 1 of the Statement, or they fall under the much broader definition of "income" used in Item 2 and should have been listed there. In either case, the Debtor had a duty to

---

6. No evidence relating to the Debtor's 1999 or 2000 income taxes was presented. The Debt-

or testified that he "could not remember" if he had filed a return for either year.

disclose them in his schedules and Statement. His deliberate failure to do so constitutes a false oath for purposes of § 727(a)(4)(A).

 "The subject matter of a false oath is 'material' and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Calder*, 907 F.2d at 955 (quoting *Chalik*, 748 F.2d at 618). There can be no doubt that the Debtor's omission of the funds is a material matter. The receipt, and apparently expenditure, of tens of thousands of dollars over the two years preceding the commencement of the bankruptcy bears a significant relationship to the Debtor's estate. Creditors and the trustee are entitled to information regarding a debtor's income so they may investigate, among other things, whether the debtor has hidden the funds to conceal them from creditors.

*Failure to List Jackson, Lay and others as creditors*

The schedules filed by the Debtor make no mention of the monies received from Jackson and Lay. In addition, although Debtor testified that he owes funds to his mother and former father-in-law, neither are included in his list of creditors. The Debtor claims that these transactions were not sufficiently documented to justify their disclosure. Cadle claims that the non-disclosure constitutes grounds for denial of the Debtor's discharge. The Court finds that the Debtor had a duty to list these claims in his Schedules.

 All debtors are required to file a list of creditors. *See* § 521(1), Fed. R.Bankr.P. 1007(a)(1). A creditor is any entity that has a claim against the debtor that arose before or at the time of the order for relief. § 101(10)(A). A claim includes "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5)(A). The obligation to list all creditors is part of the debtor's duty of full disclosure that is the *quid pro quo* for the fresh start provided by the discharge. *See In re Hicks*, 184 B.R. 954, 957 (Bankr. C.D.Cal.1995). Debtors must exercise great care in completing their schedules "so as to include *any creditor that has any arguable grounds for asserting a claim.*" *In re Gilbert*, 38 B.R. 948, 950 (Bankr. N.D.Ohio 1984) (emphasis added). "The debtor is not permitted to omit creditors from the list because the debtor does not want those creditors affected by the bankruptcy case or does not want them to know about the case or for any other reason." 4 *Collier*, ¶ 521.03[1] at 521–7.

 At trial the Debtor repeatedly referred to the transfers from Jackson and Lay as either gifts or loans. If he truly believed them to be loans, or if the transfers were loans in fact, the Debtor had a duty to list both Jackson and Lay as creditors on his schedules. Similarly, the Debtor also testified that he owes money to both his mother and his former father-in-law, although he did not list them as creditors. It appears that the Debtor is playing fast and loose with the facts. He calls the transfers loans for the purpose of excluding them from disclosure as income, then relies on the fact that they are not in writing as justification for deliberately failing to list Jackson, Lay, his mother, and his former father-in-law as creditors. There seems to be a pattern forming here. To the extent that the transfers could be viewed as loans, the Court concludes that the Debtor deliberately omitted his benefactors from his list of creditors, and that

the omission is material in that it bears a relationship to the Debtor's estate.

### Failure to list the Omega stock

At the time he filed his bankruptcy petition, the Debtor owned approximately 41,000 shares of stock in Omega. According to the Debtor, Omega is a real estate development company formed by a former business associate. The Debtor testified that he received the stock sometime in the mid–1990s as payment for a debt owed to him by Omega's founder. The Debtor further testified that the stock was intended as part of an initial public offering, but that the IPO was never consummated. Thus, the Debtor stated, the stock is worthless. He also stated that he no longer possesses the stock certificates. As a result, the Debtor concluded that he was not required to disclose his interest in the Omega stock. The Court disagrees.

"The bankruptcy schedules and statement of affairs do not ask the debtor to make an assessment of what *he* thinks are important assets or debts. Debtor[s] must, under oath, list *all* creditors and assets, as well as all transfers of property within the prior year." *Superior Nat'l Bank v. Schroff (In re Schroff)*, 156 B.R. 250, 256 (Bankr.W.D.Mo.1993) (emphasis added). "If a debtor is uncertain as to whether certain assets are legally required to be included in his petition, it is his duty to disclose the assets so that the question may be resolved." *Butler v. Ingle (In re Ingle)*, 70 B.R. 979, 983 (Bankr. E.D.N.C.1987) (citing *In re Chambers*, 36 B.R. 791, 793 (Bankr.W.D.Ky.1984)). Furthermore, a debtor may not escape a § 727(a)(4)(A) charge by asserting that the omitted information concerned a worthless business relationship or holding. *See Calder*, 907 F.2d at 955. In the present case it is undisputed that the Debtor deliberately failed to list the Omega stock in his schedules. His subjective determination that the stock is worthless is insufficient to absolve him of his responsibility to report all of his assets. The stock may indeed be worthless, but that is not for the Debtor to decide. "It makes no difference that [the Debtor] does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them." *Chalik*, 748 F.2d at 618. The Debtor owned the stock when he filed his bankruptcy petition. Thus, it became part of the estate and should have been listed with his other assets. *See* § 541(a)(1).

### Failure to provide information regarding closed bank accounts

Item 11 in the Debtor's Statement reads: "List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case." The Debtor indicated that there were no such accounts. At trial the Debtor admitted that two bank accounts held in his name had been closed within one year of his bankruptcy filing. One of the accounts was held jointly by the youth baseball team coached by the Debtor. The Debtor closed this account in March 2000 so a new account could be created bearing the name of another of the team's coaches.

The second account was held in the names of the Debtor and his then-wife doing business as Global Capital Resources. This account was closed in August 1999, approximately ten months before the Debtor's bankruptcy filing. The Debtor testified that he did not disclose the youth baseball account because the funds in the account belonged to the team and were used for team expenses. He

testified that he did not disclose the second account because it was closed by his former wife. The Debtor said he thought he was obligated to list only those accounts that he himself closed. The Court is underwhelmed by both explanations. The query presented in the Statement is straightforward. It asks debtors to disclose *all* financial accounts held in the debtor's name, not just those accounts held for the benefit of the debtor. Similarly, the question requests disclosure of *all* accounts closed, not solely those accounts personally closed by the debtor. The Debtor was required to disclose both bank accounts and he does not dispute that he knowingly failed to do so. With respect to materiality, while the youth baseball account may have had no bearing on the Debtor's estate or business dealings, the second account was held in the name of the Debtor, his then wife, and his company. The materiality of its omission from the Statement is obvious.

*Failure to disclose the home foreclosure*

■ Item 5 on the Debtor's Statement asks for a list of all property repossessed by a creditor or sold at a foreclosure sale within one year preceding the commencement of the bankruptcy case. The Debtor checked the box marked "None" in response to this question. Cadle argues that the Debtor's home was sold at a foreclosure sale within one year of his bankruptcy filing. The Debtor testified that his mortgage lender foreclosed on his home sometime in the mid- to late–1990s. According to the Debtor, another lending institution stepped in to purchase the mortgage and permitted him to remain in the home for more than a year without making house payments. The second lender eventually

foreclosed and the Debtor was told to vacate the home in July 1999.

The Debtor's testimony regarding the second foreclosure was sketchy at best. Not only did he fail to remember when the foreclosure action was initiated, he could not remember the date of the eventual sale of the property. Counsel for Cadle elicited testimony from the Debtor indicating that the sheriff's sale of the home was confirmed by a state court order on July 20, 1999, less than one year prior to the bankruptcy filing. This testimony was based upon the Debtor's review of a docket sheet from the foreclosure action. The docket sheet was not admitted into evidence, however, nor was its accuracy or authenticity established. Cadle provided no documentary evidence regarding the foreclosure. Based on the record before it, the Court is unable to conclude positively that either the foreclosure or the sale occurred within one year prior to the commencement of the bankruptcy case, obligating the Debtor to disclose either event in his Statement.

*Listing income tax payments and automobile installment payments*

■ Cadle's final allegation under § 727(a)(4)(A) revolves around the Debtor's listing of expenses. The Debtor testified that he listed a $500 monthly expense for estimated federal income tax payments because, at the time he completed his schedules, he thought he could pay approximately that amount each month if he was able to settle a tax dispute with the Internal Revenue Service.[7] The Debtor admitted that he was making no payments to the IRS when he filed his bankruptcy petition and schedules, nor when he originally completed them.

---

7. The Debtor listed the IRS as the holder of a disputed $150,000 claim in his bankruptcy

Schedule E.

Bankruptcy Schedule J is titled "Current Expenditures of Individual Debtor." The instructions to this form direct debtors to estimate the average monthly expense of the debtor and the debtor's family. The Court fails to see how either the title to Schedule J or its instructions can reasonably be interpreted to permit debtors to list an estimate of what their expenses *might be* in the future should certain contingencies occur. Such prognostications are of no use in determining the state of the debtor's financial affairs at the time of filing. Furthermore, debtors are free to amend their schedules at any time during the pendency of the case should conditions so require. *See* Fed. R.Bankr.P. 1009(a). There simply is no justification for the Debtor's listing of the non-existent payments to the IRS among his monthly expenses. Nor can it be gainsaid that the listing of $500 in fictitious expenses is a material misstatement in a debtor's bankruptcy schedules.

The Debtor admitted that he neither owned nor was purchasing any vehicles at the time he filed for bankruptcy, but was driving a car owned by his mother. Notwithstanding this testimony, the Debtor listed $250 per month in installment payments for an automobile. He testified that he claimed the $250 expense based upon his estimate of what he was paying each month for automotive maintenance for his mother's car and for a vehicle driven by his then wife.[8] Debtor also listed additional "Transportation Expenses" of $165 per month.

Debtor's listing of the $250 monthly auto installment payments was false. Debtor's explanation that the payments should more properly have been listed under the heading for "Transportation" contained in the schedule of expenditures is incredible.

If the $250 per month is in fact an expense for automobile maintenance, one is left to ponder why debtor separately identified an additional $165 in monthly "Transportation Expenses." The Court finds that the effect of this false statement was to mislead creditors and the trustee as to the actual financial condition of the Debtor. The Court therefore finds that this particular misstatement was material for purposes of § 727(a)(4)(A).

The Court concludes that the Debtor knowingly made false oaths with respect to the disbursements from Jackson and Lay, the Omega stock, the bank account held jointly with his wife and his business, and the monthly expenses for income tax and automobile installment payments. The Court further concludes that each of these false oaths was material in that they related either to the Debtor's estate or to his business dealings. The only remaining question is whether the Debtor possessed the requisite fraudulent intent.

 As previously noted, "fraudulent intent may be deduced from the facts and circumstances of a case." *Calder,* 907 F.2d at 955–956; *see also Farmers Co-op. Ass'n v. Strunk,* 671 F.2d 391, 395 (10th Cir.1982) ("Fraudulent intent of course, may be established by circumstantial evidence, or by inferences drawn from a course of conduct."). A false oath caused by mere mistake or inadvertence is not sufficient to bar a debtor's discharge. Nor is an honest error or a mere inaccuracy. *See Brown,* 108 F.3d at 1294–95. However, "reckless indifference to the truth has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." *Tully,* 818 F.2d at 112 (internal quotes, citation and footnote omitted). Upon consideration of all the

---

**8.** At trial, Debtor admitted that he understood an auto installment payment to be a payment made toward the purchase of an motor vehicle.

facts and circumstances, the Court concludes that the Debtor's false oaths were made fraudulently or with such reckless indifference to the truth as to warrant the denial of his discharge.

First, the Court notes that this is not a case involving an unsophisticated debtor with little or no knowledge of business or commerce. The Debtor here holds an undergraduate degree in business management with a minor in economics. He has been engaged in the field of commercial real estate transactions and finance for thirty-one years. Moreover, in preparing his bankruptcy Schedules and Statement of Financial Affairs he had the assistance of an attorney who practices regularly before this Court. The Court does not believe that the numerous omissions and misstatements contained in the Schedules and Statement of Financial Affairs are products of mere mistake or honest error.

Second, Debtor characterized the disbursements from Jackson and Lay in various ways in order to serve his interests of the moment, calling them income in state court, loans at his 2004 exam, and gifts at trial. The Debtor testified that he changed bank accounts several times prebankruptcy to escape the garnishment implemented by Cadle. Clearly he was attempting to place his personal funds, many of which came from Jackson and Lay, beyond the reach of Cadle and perhaps other creditors.

Third, the Debtor made no less than five separate material omissions or misstatements in his schedules and Statement. A pattern of nondisclosure or falsehood can be a significant factor in determining fraudulent intent. *See Calder*, 907 F.2d at 956; *First Texas Sav. Ass'n v. Reed (In re Reed)*, 700 F.2d 986, 991 (5th Cir.1983). The Debtor conducted only a perfunctory review of his schedules and Statement before filing them, and concluded they re-

quired no substantial changes. Moreover, he took it upon himself to determine which items warranted disclosure and which did not. The Court was struck by the cavalier attitude the Debtor took with respect to his duties under the Code.

The Court is mindful of the admonition that objections to discharge should be construed liberally in favor of debtors and strictly against objecting creditors. *See Juzwiak*, 89 F.3d at 427. At the same time, however, it recognizes that "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Id.* In the present case the Court is faced with a Debtor who sought to avail himself of that privilege without fulfilling its accompanying obligations. Whether his conduct resulted from actual intent to defraud his creditors or from a reckless indifference to the truth the result is the same; the Court, the trustee, and creditors were deprived of information at the outset of this case that they were entitled to have. Our bankruptcy system cannot function if debtors are permitted to decide for themselves which assets and liabilities to disclose in their filing papers and which ones to exclude. Nor can it function if they are allowed to claim imaginary expenses. This Court will not sanction such behavior.

## Conclusion

Debtor shall not be granted a discharge in this case.